COMMONWEALTH *vs.* HIRAM P. HARRIMAN.

Barnstable.　Jan. 18, 19. — Feb. 28, 1883.　FIELD & W. ALLEN, JJ., absent.

Under the Const. Mass. *c.* 3, art. 1, providing that "all judicial officers, duly appointed, commissioned and sworn, shall hold their offices during good behavior, . . . . provided, nevertheless, the Governor, with consent of the Council, may remove them upon the address of both houses of the Legislature," a judicial officer may be removed by address, for misconduct and maladministration in office, although he is liable to trial therefor, by impeachment, by *c.* 1, § 2, art. 8, of the Constitution.

An address to the Governor by both houses of the Legislature, under the Const. Mass. *c.* 3, art. 1, requesting the removal of a judicial officer, need not assign any reasons therefor.

INFORMATION, in the nature of a *quo warranto*, filed, June 28, 1882, by the Attorney General in behalf of the Commonwealth, at the request and upon the relation of Joseph M. Day, alleging that the defendant was usurping the office of Judge of Probate and Insolvency for the county of Barnstable. The case as it appeared from the pleadings, and the report of *C. Allen*, J., before whom it was heard, was as follows :

The relator was appointed Judge of Probate and Insolvency for the county of Barnstable, on May 19, 1858, by the Governor of the Commonwealth, with the advice and consent of the Council, and a commission was issued to him, by the terms of which he was " to hold the said office during the term of his good behavior therein, unless he shall be sooner removed in the manner prescribed by our Constitution." He took the oaths of office, and continued to do its duties until May 26, 1882, when he was removed from his office by the Governor, with the consent of the Council, upon the address of both houses of the Legislature. On June 7, 1882, the Governor nominated the defendant to fill the vacancy created by such removal, and his appointment was, on June 14, 1882, consented to by the Council ; a commission was issued to him, he took the oaths prescribed by law, and entered upon the duties of his office.

The relator, to support the averments of his replication to the answer of the defendant, that he had been removed for alleged misconduct or maladministration in office, and not for any disability or infirmity, moral or physical, offered in evidence the

report of a joint special committee of the Legislature, which set forth the charges against the relator, on which a hearing was had before the committee. This report, being objected to, was excluded.

The relator also offered in evidence a certificate of the Secretary of the Commonwealth, that the address of the Legislature to the Governor was in these words : " The two branches of the Legislature in General Court assembled respectfully request that your Excellency would be pleased, with the consent of the Council, to remove Joseph M. Day from the office of Judge of Probate and Insolvency for the county of Barnstable ; " and that no other communication from the Legislature, or either branch thereof, to the Governor, or to the Council, in said matter, was or had been in the custody of the Secretary. This certificate was admitted, no objection being made to it. The judge reported the evidence excluded, and reserved the case for the determination of the full court.

If the evidence so excluded was incompetent, such judgment was to be entered as to law might appertain; otherwise, judgment to be entered on the case as reserved, with the evidence excluded.

*T. H. Talbot & J. F. Botume,* for the relator. 1. The principal question in this case is as to the true construction of this clause of our Constitution : "All judicial officers, duly appointed, commissioned and sworn, shall hold their offices during good behavior, excepting such concerning whom there is different provision made in this Constitution : provided nevertheless, the Governor, with consent of the Council, may remove them upon the address of both houses of the Legislature." Const. Mass. *c.* 3, art. 1. A previous provision of the Constitution declares the Senate to be " a court with full authority to hear and determine all impeachments made by the House of Representatives, against any officer or officers of the Commonwealth, for misconduct and maladministration in their offices." It further provides, that " previous to the trial of every impeachment the members of the Senate shall respectively be sworn, truly and impartially to try and determine the charge in question, according to evidence." Const. Mass. *c.* 1, § 2, art. 8.

The question then is whether a judicial officer may be removed by address for misconduct and maladministration in office,

notwithstanding the Constitution has made special provision for the trial of such offences, one penalty for which is declared to be his "removal from office," or whether the power of removal by address applies only to cases of physical or mental inability to perform the duties of his office, and to cases where he has already been convicted by a court of justice.

The clause giving the power of removal by address establishes a tenure of office during good behavior; and it is taken from the English Settlement Act of 1700. This act provides, that "judges' commissions be made *quamdiu se bene gesserint,* and their salaries ascertained and established; but upon the address of both houses of Parliament it may be lawful to remove them." St. 12 & 13 Wm. III. *c.* 2, § 3.

Although, before 1700, the tenure of a judicial office depended on the pleasure of the Crown, yet the Crown by the act of removal did not determine the behavior of a judge as good or bad. That could be determined only by due process of law. *Bacon's case,* 2 How. St. Tr. 1087. *Scroggs's case,* 8 How. St. Tr. 163, 193, 216. *Clarendon's case,* 6 How. St. Tr. 291, 330, 334, 350. In the enactment of 1700, "good behavior" meant something the opposite of which could only be ascertained judicially; and Parliament, by enacting that judicial officers should hold office during good behavior, intended that they should hold until the opposite of good behavior should be judicially established. Such was the construction put by the House of Lords upon the English statutes in 1806, in the only case in which, in that country, so far as we know, an attempt has been made to remove a judge by address. In that case, a proceeding to remove by address a judge for misconduct in office was ended upon the ground, as the debates show, that it was not within the intent of the statutes.*

---

* The case referred to is that of Mr. Justice Fox, of the Court of Common Pleas, in Ireland. In 1804, petitions were presented both to the House of Commons and to the House of Lords for his removal by address, for misconduct in office. In the Commons, the petitions were laid upon the table. In the Lords, the case was heard *ex parte* before a committee, and afterwards was partly heard before the House, the respondent being present by counsel. Finally, in 1806, a motion was made by Lord Grenville that the proceeding be adjourned for two months, to a day when the House in all probability would not meet. This was done for the express purpose of

The practice in this Commonwealth conforms to our view of the law. Prior to the case at bar, no one has been removed from a judicial office for misconduct in office, except upon a judicial ascertainment of such misconduct. In 1803, Paul D. Sargent and William Vinal, judges of the Court of Common Pleas were removed from office by address. But the address states the cause as follows: "Having been duly convicted before the Supreme Judicial Court, of the crime of wilful extortion in their offices of justices of the Court of Sessions." * In

putting an end to the proceeding. The motion was carried by a majority of nine. See 1 Hansard, ii–vii.

The case is of interest, as being the first in which the power of removal by address was invoked in England. The debate on the motion of Lord Grenville is reported 1 Hansard, vii, 755–772. Among those who spoke in favor of the motion were Lord Grenville and Lord Chancellor Erskine. Opposed to it were Lord Eldon and others. On p. 788 of the volume referred to is recorded the formal protest of the Marquis of Abercorn and of Lord Eldon, and of others whose names are not given. It was contended in support of the motion that the power of removal by address was intended to apply where a judge was physically incapacitated from performing the duties of his office, or where he had been tried and convicted elsewhere. Some stress was also laid upon the fact, that, if the House of Lords should vote in favor of an address, the House of Commons might see fit to proceed by impeachment, and then the case would come before the House of Lords prejudged and predetermined. Lord Grenville also relied upon the case of Lord Chief Justice Holt, which was before the House of Lords in 1698, as a precedent. But the only question in that case was whether the Chief Justice should be compelled to give to a committee of the House of Lords his reasons for a judgment rendered by him in the King's Bench. See 2 Campbell's Lives of the Chief Justices, 148–152. The protest filed by Lord Eldon and others, above referred to, states that "it is the clear right of this House, according to the provisions of the Act of Settlement of the 12th and 13th William III., to entertain in the first instance a motion for an address to his Majesty for the removal of a judge, provided the facts alleged as the grounds of the address shall be sufficient to justify the proceeding, and shall have been proved to the conviction of the House."

\* The address, which is on file in the office of the Secretary of the Commonwealth, is as follows:

"May it please your Excellency: The two branches of the General Court, sensible how important it is that the characters of men appointed to superintend the execution of the laws should be pure and unsullied, and that their integrity, uprightness and disposition to obey the laws should not be subject to any just suspicion, take the liberty to make known to your Excellency, that Paul Dudley Sargent, of Sullivan in the county of Hancock,

1821, James Prescott was removed from the office of Judge of Probate for the county of Middlesex; but he was formally tried by the Senate as a court of impeachment. See *Prescott's case*. In 1858, Edward G. Loring was removed by address from the office of Judge of Probate for the county of Suffolk; but his was not a case of official misconduct. See Special Message of the Governor to the Legislature, of March 19, 1858.

2. The clause of the Constitution declaring that " the Senate shall be a court with full authority to hear and determine all impeachments . . . . for misconduct and maladministration " in office, further provides that " the party so convicted shall be, nevertheless, liable to indictment, trial, judgment and punishment, according to the laws of the land." It was stated by

---

Esquire, and William Vinal, of Vinalhaven, in the same county, Esquire, justices of the peace within and for that county, and also justices of the Court of Common Pleas in and for said county, have been duly convicted, before the Supreme Judicial Court, holden within and for said county of Hancock, for the counties of Hancock and Washington, of the crime of wilful and corrupt extortion in their offices of justices of the Court of Sessions, by means of which conviction the confidence of the people must be in a great degree diminished in the said Sargent and Vinal, and the honor and dignity of the government require that men against whom such charges have been substantiated should not be permitted to exercise offices of such high trust and importance. The General Court therefore request that your Excellency would be pleased, by and with the advice and consent of Council, to remove the said Paul Dudley Sargent and William Vinal from their said offices of justices of the Court of Common Pleas, and of justices of the peace in and for the said county of Hancock."

John Quincy Adams and John Woodman were allowed by the Senate to file the following reasons for their dissent from the vote authorizing the address: " First. Because the grounds alleged in the said address for removal are for official misdemeanors; and they conceive it to be the intention of the Constitution that no judicial officer should be removed from office by the mode of an address of the two Houses, on the ground of offences for the trial of which the Constitution has expressly provided the mode of impeachment. Second. Because they consider the independence of the judiciary as materially affected by a mode of proceeding which in its effects must make the tenure of all judicial officers dependent upon the verdict of a jury in any one county of the Commonwealth. Third. Because the decision of the Senate in this case, affecting in the highest degree the rights, the character and reputation of two individual citizens of this Commonwealth, ought not to have been taken without giving them an opportunity previously to be heard in their own defence." Senate Journal, 1802–3, p. 339.

Mr. Lemuel Shaw, one of the managers in the trial of Judge Prescott, that the Senate in such a case sits as "a court of justice, of criminal jurisdiction, possessing all the attributes and incidents of such a court." *Prescott's case*, 182. Jurisdiction therefore being given to the Senate, as a court, of the offence of judicial misconduct, such jurisdiction must be exclusive, except so far as concurrent jurisdiction is given to some other tribunal. The Constitution states one express exception, namely, the right of the appropriate tribunal to proceed by indictment, but it states no other. This clause of the Constitution makes judicial misconduct a crime, and designates the Senate as the tribunal to try it. Being a crime, it falls within the 12th article of the Declaration of Rights, which declares that "No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him." It also gives him the right "to meet the witnesses against him face to face, and to be fully heard in his defence by himself, or his counsel, at his election." Whereas, if the contention of the defendant is correct, that the power of removal by address exists for misconduct in office, no cause need be assigned, no trial need be had, and, if the wills of the Governor and Council and of both branches of the Legislature are in unison, a judge may be removed because such is their pleasure, and the provision that "judicial officers shall hold their offices during good behavior" becomes of no effect. No inference can be drawn from the general phraseology of the clause relating to removal by address, that it was intended to cover a matter before specially provided for. *Field* v. *People*, 2 Scam. 79, 83. *Warner* v. *People*, 2 Denio, 272. *Page* v. *Hardin*, 8 B. Mon. 648, 672. *Lowe* v. *Commonwealth*, 3 Met. (Ky.) 237, 242.

3. The phraseology of the clause of the Constitution in question indicates that it was not intended to apply to the case of maladministration in office. It declares that "all judicial officers shall hold their offices during good behavior: provided, nevertheless, the Governor, with consent of the Council, may remove them." The natural meaning of this is, that, notwithstanding good behavior, they may be removed, not that they may be removed for bad behavior. That was already provided

for by impeachment. A proviso cannot by implication repeal
the enacting clause. It merely excepts something therefrom.
It may except the case of physical disability out of the tenure of
good behavior; it can do no more. It cannot reach the subject
of bad behavior, which is not in the enacting clause. In *Minis*
v. *United States*, 15 Pet. 423, 445, it is said by Mr. Justice
Story, " The office of a proviso, generally, is either to except
something from the enacting clause, or to qualify or restrain its
generality, or to exclude some possible ground of misinterpreta-
tion of it, as extending to cases not intended by the Legislature
to be brought within its purview."

It was generally admitted in the Constitutional Convention of
1820, that the intent of the framers of the Constitution of 1780
was to limit the power of removal by address to the case of
physical and mental disability, and some of those who opposed
the amendments then proposed did so upon the ground that they
were unnecessary, as the power of removal by address applied
to cases where a trial would be ineffectual, or where it ought
not to be had.* [The counsel then proceeded to discuss the

* As the opinions expressed in the debates in the Constitutional Conven-
tion of 1820 were relied upon by the counsel for both parties in argument,
and are referred to by the court in the opinion, an abstract of them so far
as they relate to the point in issue is here given. The references are to the
pages of the Journal of Debates in the edition of 1853.

The first debate arose on the consideration of the resolution of the select
committee, which proposed to alter the Constitution so that judicial officers
should be removable by the Governor and Council upon the address of two
thirds (instead of a majority) of each branch of the Legislature.

Mr. Pickman, of Salem, said, p. 473, that " it was proper to have a pro-
vision of a similar nature, to meet cases that were not the proper subject of
impeachment, such as incapacity from natural infirmities; and he thought
that requiring the consent of two thirds of each branch of the Legislature
would secure the public in cases of manifest incapacity of this kind, and at
the same time give greater independence to the judges."

Mr. Hubbard, of Boston, (afterwards Mr. Justice Hubbard,) said, p. 474,
that " the Constitution was defective in not sufficiently securing the inde-
pendence of the judges;" and asked if a judge was free, when the Legis-
lature might have him removed whenever it pleased. He further argued,
that the tenure of office of judges was not during good behavior, if the
Legislature might deprive them of their office, although they had com-
mitted no crime; and that " sufficient provision was made in the case of
misconduct in the power of impeachment."

admissibility of the evidence offered to show that the removal was for acts of official misconduct, admitting that the question

---

Mr. Shaw (afterwards Chief Justice Shaw) said, p. 476: "The general principle was, that they [the judges] should be independent of other persons during good behavior. What is meant by good behavior? The faithful discharge of the duties of the office. If not faithful, they were liable to trial by impeachment. But cases might arise when it might be desirable to remove a judge from office for other causes. He may become incapable of performing the duties of the office without fault. He may lose his reason, or be otherwise incapacitated. It is the theory of our government that no man shall receive the emoluments of office, without performing the services, though he is incapacitated by the providence of God. It is necessary therefore that there should be provision for this case. But in cases where it applies, the reason will be so manifest as to command a general assent. It must be known so as to admit no doubt, if a judge has lost his reason, or become incapable of performing his duties. As it does not imply misbehavior, if the reason cannot be made manifest so as to command the assent of a great majority of the Legislature, of two thirds at least, there can be no necessity for the removal. By the Constitution as it stands, the judges hold their offices at the will of the majority of the Legislature."

Mr. Freeman, of Sandwich, said, p. 477, that "he should have liked this clause as well if the committee had proposed to limit the power of the Governor and Council to remove judges on the address of the two branches of the Legislature to specific cases, such as insanity or disability. But he was willing to adopt the resolution now reported. The judges were not now independent of the other departments of government."

Mr. Prescott, of Boston, argued in favor of the resolution, on the ground that the judges should be independent, and said, p. 477: "The two other departments may remove them without inquiry — without putting any reason on record. It is in their power to say that the judges shall no longer hold their offices, and that others more agreeable shall be put in their places. . . . . The mode of removal by address was introduced into the British government for the purpose of restraining the power of the Crown, but into ours for another purpose — to provide for a case which could not properly be reached by the power of impeachment."

Mr. Daniel Davis, of Boston, said, p. 478: "The Constitution contemplates removal of judges from office for two causes only. For crime, by impeachment on the grand inquest by the representatives — and for being disqualified to perform the duties of the office by the visitation of God. . . . . The power of removal by address, which was intended to apply only to cases of disqualification by the visitation of God, in fact extended much farther, and was liable to be abused. It was a defect which ought to be remedied. . . . . If the resolution were before the committee in a form which admitted of amendment, he would propose to alter it in such manner

was immaterial, if the power of removal by address applied to impeachable offences. This portion of the argument is omitted.]

*B. Wadleigh & G. A. King*, for the defendant.

that the officer to be removed should have a right to be heard. No reason need now be given for the removal of a judge, but that the Legislature do not like him."

Mr. Childs, of Pittsfield, said, p. 479, that " it was in violation of an important principle of the government that the majority of the Legislature, together with the Governor, should not have the power of removal from office."

Mr. Cummings, of Salem, p. 479, argued in favor of the Constitution as it was, on the ground that " this provision is not intended to embrace cases of crime — it is only for cases when they become incompetent to discharge their duties."

Mr. Holmes, of Rochester, said, p. 481: " When a judicial officer has been guilty of maladministration, he will be removed by impeachment. When it was necessary to remove a judge for any other cause, he thought that two thirds of both branches would always concur in the removal."

Mr. Webster, p. 482, said: " As the Constitution now stands, all judges are liable to be removed from office by the Governor, with the consent of the Council, on the address of the two houses of the Legislature. It is not made necessary that the two houses should give any reasons for their address, or that the judge should have an opportunity to be heard. I look upon this as against common right, as well as repugnant to the general principles of the government."

The clause in question was then struck out by a vote of 210 in the affirmative to 105 in the negative.

The second debate was on the amendment proposed by Mr. Webster, p. 489, that " No address for the removal of any judicial officer shall pass either house of the General Court, until the causes of removal are first stated, and entered on the journal of the house in which it originated, and a copy thereof served on the person in office, that he may be admitted to a hearing in his defence."

Mr. Childs, p. 521, said that " he thought that, by adopting the amendment, the intention of the provision for removal of judges by address of the two houses would be done away. It placed this proceeding on the footing of impeachment, and it might as well be struck out. The object in giving the power to the Legislature was, that judges might be removed when it was the universal sentiment of the community that they were disqualified for the office, although they could not be convicted on impeachment."

Mr. Austin, of Boston, p. 522, thought the alteration unnecessary; and, after referring to the liability of judges to punishment, for great crimes, by impeachment, said that the Constitution admitted that there might be

MORTON, C. J.   This is an information in the nature of a *quo warranto*, filed by the Attorney General, in behalf of the Commonwealth, at the relation of Joseph M. Day, to try the title of the defendant to the office of Judge of Probate and Insolvency for the county of Barnstable.   The relator formerly held that office, having been appointed and qualified in 1858; and, in 1882, he was removed therefrom by the Governor, with consent of the Council, upon the address of both houses of the Legislature; and the defendant was appointed in his place.

---

cases in which judges might be removed, without supposing a crime; that if a judge had so far lost public confidence that his usefulness would be destroyed, he ought to be removed, " but if witnesses were to be summoned to prove specific charges, it would be impossible to remove him."

Mr. Justice Story, arguing in favor of the amendment, p. 524, remarked: " It was said that the judges should hold their offices during good behavior — the terms were so in the Constitution — but while another clause of the Constitution remained, the fact was not so.   The Governor and Council might remove them on the address of a majority of the Legislature, not for crimes and misdemeanors, for that was provided for in another manner, but for no cause whatever — no reason was to be given. . . . . He does not hold the office by the tenure of good behavior, but at the will of a majority of the Legislature, and they are not bound to assign any reason for the exercise of their power.   *Sic volo, sic jubeo, stet pro ratione voluntas.*   This is the provision of the Constitution, and it is only guarded by the good sense of the people."   And, on p. 526, he contended that the object of the St. 12 & 13 Wm. III. " was not to give power to Parliament to remove the judges, but to induce the King, by a compromise, to give up a greater right."

The resolution was then passed by a vote of 221 to 3.   It was submitted to the people with two other proposed changes, one of which provided that justices of the peace might be removed by address, the other being that the Governor and the two branches of the Legislature should not be authorized to propose questions to the justices of the Supreme Judicial Court and require their opinions thereon.   The three proposed changes were voted on as one, and were not ratified by the people, the majority against them being 2047 in a vote of 26,989.

In his argument in *Prescott's case,* in 1821, Mr. Shaw, one of the managers, said: "It is true, that by another course of proceeding warranted by a different provision of the Constitution, any officer may be removed by the Executive, at the will and pleasure of a bare majority of the Legislature; a will, which the Executive in most cases would have little power and inclination to resist.   The Legislature, without either allegation or proof, has but to pronounce the *sic volo, sic jubeo,* and the officer is at once deprived of his place, and of all the rank, the powers and emoluments belonging to it."   *Prescott's case,* 181.

The relator contends that his removal was unconstitutional and void; that he is now *de jure* the Judge of Probate and Insolvency for the county of Barnstable; and therefore that the defendant has no title to the office. The principal ground upon which he founds his claim is that the charges upon which he was removed were charges of misconduct and maladministration in office, for which he was liable to impeachment, and that the constitutional power of removal by address does not include the power to remove for offences which are impeachable. The question is an important one.

No student of the Constitution and its history can fail to see that it was the purpose of those who framed it, and of the people who adopted it, to establish a carefully prepared system of government, consisting of three coördinate departments, the executive, legislative and judicial, each, as far as practicable, independent of the others, each balancing yet protecting, checking yet preserving, the others.

In this division of the functions of government, it was undoubtedly deemed to be of the first importance to the protection of the liberties and rights of the citizens, that the judiciary should be put upon such a basis, and protected by such constitutional guaranties, that it should be fearless and independent, and free from undue control and encroachments by the other departments.

These purposes could not be more forcibly stated than in the impressive language of the Declaration of Rights: "It is essential to the preservation of the rights of every individual, his life, liberty, property and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit. It is, therefore, not only the best policy, but for the security of the rights of the people, and of every citizen, that the judges of the Supreme Judicial Court should hold their offices as long as they behave themselves well; and that they should have honorable salaries ascertained and established by standing laws." "In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative

and judicial powers, or either of them : the judicial shall never exercise the legislative and executive powers, or either of them : to the end it may be a government of laws and not of men." Declaration of Rights, arts. 29, 30.

The Declaration of Rights is entitled " A Declaration of the Rights of the Inhabitants of the Commonwealth of Massachusetts." It was intended as a general declaration of the great, fixed and fundamental principles of reason and right which underlie our system of government and are the safeguards of liberty. It declares general principles which are to guide all departments of the government in their respective duties of making, executing and interpreting laws; but it does not purport to lay down specific rules of action, or to exactly define the extent and limitations of the powers of each department. For these we must look to the other part of the Constitution, " the Frame of Government." And when we find that the general statements of the Declaration of Rights are qualified and limited by more specific provisions upon the same subject in the Frame of Government, the latter must control and govern.

The chapter upon the " Judiciary Power " provides that " The tenure, that all commission officers shall by law have in their offices, shall be expressed in their respective commissions. All judicial officers, duly appointed, commissioned and sworn, shall hold their offices during good behavior, excepting such concerning whom there is different provision made in this Constitution : provided nevertheless, the Governor, with consent of the Council, may remove them upon the address of both houses of the Legislature." Const. Mass. *c.* 3, art. 1. The decision of this case depends upon the true construction of this article.

The relator contends that the only effect of the proviso is to give the power of removal by address for causes other than misconduct and maladministration in office, and that for such misconduct an exclusive remedy is provided by impeachment under *c.* 1, § 2, art. 8, of the Constitution. We are not able to see any just rule of construction by which we can thus limit and qualify the plain language of the proviso. The language is broad and general; in its terms it includes a removal for any cause which is deemed by the legislative and executive departments

sufficient. If it had been intended to exclude from this provision the power to remove for misconduct in office, leaving that to be dealt with by impeachment exclusively, it would have been so stated. Neither this article nor the article on impeachment contains any indication that the power of impeachment was to exclude the power of removal by address. We must give to the proviso the broad meaning which its language imports.

The article reaffirms the great principle asserted in the Declaration of Rights, that judicial officers shall hold their offices during good behavior; but it was deemed wise, as a check upon the absolute power and independence of the judicial department, to confide in the other two coördinate branches of the government the exceptional power of removing judicial officers by address when an exigency requires it, of which, from the nature of the case, they must be the sole judges. The obvious and natural meaning of the language used seems to us to require this construction, and our view is confirmed by the history of this provision.

It was undoubtedly taken from the English act of Parliament by which the Crown was settled upon the house of Hanover, which provided that, "after the said limitation shall take effect as aforesaid, judges' commissions be made *quamdiu se bene gesserint*, and their salaries ascertained and established; but upon the address of both houses of Parliament it may be lawful to remove them;" and from the later statute of 1 Geo. III. *c.* 23, § 1, containing the° same provision as to removal by address.* The language of the provisions of these statutes is clearly broad enough to authorize a removal by address for any cause which might seem sufficient to both houses of Parliament, including misconduct in office.

---

* Prior to the St. of 1 Geo. III. *c.* 23, § 1, which was passed in 1760, the commissions of judges terminated on the demise of the Crown. The language of the act is: "The commissions of judges for the time being shall be, continue and remain in full force, during their good behavior, notwithstanding the demise of his Majesty (whom God long preserve) or of any of his heirs and successors; any law, usage or practice to the contrary thereof in any wise notwithstanding. Provided always, . . . . that it may be lawful for his Majesty, his heirs and successors, to remove any judge or judges upon the address of both houses of Parliament."

The draft of a constitution prepared by the Council and Representatives acting as a convention, in 1778, contained no provision for removal by address. It was rejected by the people, and is of no importance in this discussion.

In September 1779, was assembled the Convention of Delegates, elected for the special purpose of framing a Constitution, which continued in existence until June 1780, and the result of whose labors was the Constitution of 1780, as ratified and adopted by the people. It is to be regretted that we have so meagre a report of the doings of this important Convention. Among its first acts was the appointment of a committee to frame a declaration of rights and the form of a constitution, to be laid before the Convention. This committee afterwards reported in favor of a declaration of rights and frame of government, which was mostly the work of John Adams, and which served as the groundwork of the future deliberations of the Convention. See 4 Adams's Works, 215, 216.

It is clear from the imperfect record which has come down to us, that the subject of the tenure of office of the judiciary was considered as a matter of the first importance. The clauses which we are considering were, as the journal tersely says, "largely debated," and were finally adopted by the Convention in the same form substantially as that in which they were drafted and presented by Mr. Adams. In this form they were accepted by the people, and have stood unaltered as the fundamental law to this day, notwithstanding the several attempts which have been made to modify them.

The power of removal by address thus established has been infrequently exercised, but it is an instructive fact that in 1803 two justices of the Court of Common Pleas were removed by address for extortion in office, misconduct for which they were clearly liable to impeachment. Added significance is given to this action of the legislative and executive departments by the fact that Governor Strong, who removed them, was a member of the Convention and of the committee which prepared the draft of the Constitution.

In the Convention of 1820, elected by the people to revise the Constitution, many of its most prominent members, who are recognized as among the most eminent jurists and statesmen of

the country, made a strenuous effort to change the provision for
removal by address established by the Constitution of 1780.
Their arguments were, that the provision, as it stood, gave an
absolute and unlimited power to the legislative and executive
departments, at their will and pleasure, to remove a judge, with-
out a judicial ·hearing and without assigning any cause; and
that this endangered the freedom and independence of the judi-
ciary, and was inconsistent with the great principles of the Dec-
laration of Rights.    They proposed to amend the third chapter
of the Constitution, on the judiciary power, so that it should
read that "the Governor, with the consent of the Council, may
remove any judicial officer upon the address of two thirds of the
members present of each house of the Legislature." This propo-
sition was rejected by the Convention by a large majority.    The
same members were more successful in inducing the Conven-
tion to adopt an amendment, providing that "No address for
the removal of any judicial officer shall pass either house of the
Legislature until the causes of such removal are first stated and
entered on the journal of the house in which it shall originate,
and a copy thereof served on the person in office, so that he
may be admitted to a hearing in his defence before each of said
houses."    This amendment was submitted to the people and
rejected by them, they thus decreeing that the power of removal
by address should stand as it did in the Constitution of 1780.
No change was made in this provision in the Constitution which
was submitted to the people by the Convention of 1853, and
rejected by them.

We think the uniform practice since 1780 has been to regard
this provision as conferring an unrestricted power of removal
upon the legislative and executive departments.    When we
consider the origin and history of the provision, the obvious and
natural meaning of its language, and the uniform practical con-
struction which has been given to it, we are forced to the
conclusion that the intention of the people was to entrust the
power of removal of a judicial officer to the two coördinate
branches of the government without limitation or restriction.

The relator strongly contends that, upon this construction
of the Constitution, the tenure of judicial office is not during
good behavior, but at the will of the other departments of the

government. It seems to us that this is arguing against the existence of a power clearly conferred, from the fact that it may be abused and perverted. There is no more danger of the abuse of the power of removal, if it includes the right to remove for impeachable offences, than there would be if it were confined, as the relator contends it should be, to cases of physical, mental or moral disability of a judicial officer, of which necessarily the removing power must be the sole judge. Any power may be abused. The judiciary might corruptly declare any law or body of laws to be unconstitutional and invalid, and thus encroach upon the powers of the Legislature ; yet no one doubts the right and duty of the judiciary to declare invalid any law which in its judgment violates the Constitution.

In confiding to the two coördinate branches of the government this important and exceptional power of removing the judiciary, the people found a sufficient protection to the substantial independence of the judicial department in the constitutional guaranties thrown around it, in the fact that the removal can only be made by the concurrent action of both houses of the Legislature and of the Governor and Council, all of whom are directly answerable to the people at frequently recurring periods, and in the trust and confidence they may rightfully repose in their servants and agents that in the exercise of any power committed to them they will act in obedience to their oaths of office, and in the spirit of the fundamental principles of the Constitution.

The view we have taken of the principal question involved disposes of the other questions raised by the relator at the hearing. They relate to the offer of evidence by him to prove the causes for which he was removed, and the evidence upon which the Legislature voted the address. The Constitution authorizes the removal without any reason being assigned for it; and therefore it is wholly immaterial what evidence or causes induced the Legislature to vote the address, or led the Governor and Council to act upon it. The evidence therefore was rightly excluded.                    *Information dismissed.*