LEWIS W. MOULTON, Relator, *vs.* EVERETT G. SCULLY.

Cumberland.   Opinion February 26, 1914.

*Address.   Adoption.   Article . IX, Section 5, of the Constitution.   Causes.*
*Constitution.   Information.   Initiative and Referendum.   Jurisdic-*
*tion.   Quo Warranto.   Records.   Removal.   Resolution.*
*Section 69 of Chapter 29 of Revised Statutes.*

1.   Jurisdiction is conferred upon the Legislature in address proceedings by Article IX, section 5 of the Constitution of Maine.

2.   Under this provision of the Constitution in address proceedings by the Legislature, three things are required to be done:   (1) state the causes of removal and enter them upon the journal; (2) serve notice on the person in office, and (3) admit him to a hearing.

3.   In address proceedings to remove any officer from office under Article IX, section 5 of the Constitution, it is a constitutional trial by a coördinate department of the government, the Legislature acting as a constitutional tribunal and limited in authority only by the language of Article IX, section 5.

4.   The causes stated must be legal causes and such as specially relate to and affect the administration of the office and must be restricted to something of a substantial nature directly affecting the rights and interests of the public.

5.   They must be causes attaching to the qualification of the officer, or his performance of his duties, showing that he is not a fit or proper person to hold the office.

6.   Non-feasance specially relates to and affects the administration of the office of sheriff and is of a substantial nature affecting the rights and interests of the public, and manifestly constitutes a charge of unfitness to hold office.

7.   The Legislature, under the Constitution, in address proceedings, after it has acquired jurisdiction, is acting in the exercise of sovereign power, and is accountable only to the people for the manner in which it performs its functions.

8.   While it is essential that all the facts constituting an offense must be so stated as to bring the defendant precisely within the law, it is a rule of universal application that when a statute creates an offense and sets out the facts which constitute it, the offense may be sufficiently charged in the language of the statute.

9. When the offense is prohibited in general terms in one section of the statute, and a penalty prescribed, and in another section entirely distinct, there is a particular description of the elements which shall constitute the offense, there is no reason, upon principle or authority, why the indictment should contain anything more than the general description.

10. Whenever a crime consists of a series of acts, they need not be specially described, for it is not each or all the acts of themselves, but the practice or habit which produces evil and constitutes the crime.

11. The central idea of the change of section 1 of part third of Article IV of the Constitution, which provides for the initiative and referendum was to confer the law making power in the last analysis upon the people themselves and applies only to legislation, to the making of laws, whether it be a public act, a private act, or a resolve having the force of law.

12. That the power of the Legislature to recommend the removal of a public officer by address still abides unshorn, as it has existed since the adoption of our Constitution, that this important safeguard of public welfare was neither repealed nor abridged by the adoption of the initiative and referendum and that the resolve in the case at bar became effective upon its adoption.

On report. Information dismissed with costs.

This is an action of quo warranto, brought at the relation of Lewis W. Moulton, who claims to be sheriff of Cumberland County against Everett G. Scully, appointed to the office of sheriff of Cumberland County by Hon. William T. Haines, Governor of Maine, upon the adoption of an address to him by both branches of the Seventy-sixth Maine Legislature, calling for the removal of said Lewis W. Moulton from said office; entered at the April Term, 1913, of the Supreme Judicial Court for Cumberland County.

The address to the Governor by the Legislature, requesting the removal from office of Lewis W. Moulton, sheriff of Cumberland County, alleged the following causes: "Because the said Lewis W. Moulton, who is now holding the office of sheriff for the County of Cumberland, and who has held said office continuously since the first day of January, A. D. 1913, wilfully or corruptly refuses, or neglects, to perform the duties required of him as such sheriff, by section 69 of chapter 29 of the Revised Statutes of Maine, as amended by chapter 41 of the Public Laws of 1905, and particularly his duties as said sheriff in enforcement of the laws against the illegal sale of intoxicating liquors and the keeping of drinking houses and tippling shops." This address was adopted by both

branches of the Legislature, and on the 24th day of April, 1913, the members constituting the Governor's Council voted to advise the Governor and to consent to the removal of the relator, Lewis W. oulton, from the office of sheriff of Cumberland County. On the 28th day of April, 1913, the Governor removed said Lewis W. Moulton from said office to take effect May 8, 1913, and appointed Everett G. Scully of Portland, to succeed said Moulton in said office, to take effect upon the date above named, and authorized and empowered him to fulfill the duties of that office according to law, and to have and to hold the same, together with all the powers, privileges and emoluments thereto of right appertaining unto him, the said Everett G. Scully, until the first day of January, 1915, or until another shall be chosen in his place, if he shall so long behave himself well in said office, unless sooner removed by the Governor and Council for the time being, and before the commencement of this action was duly qualified as such. The respondent, Everett G. Scully, made answer to the writ of information in the nature of quo warranto, and the relator, Lewis W. Moulton, filed a replication. At the conclusion of hearing in above case, the same was reported to the Law Court to be determined by said court upon the pleadings and agreements of the parties. The information, answer, replication and agreements of counsel, and all papers, documents and records are made a part of the case.

The case is stated in the opinion.

*William R. Pattangall, Irving E. Vernon, William H. Gulliver,* for relator.

*Scott Wilson, and Eben Winthrop Freeman,* for respondent.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, HANSON, PHIL-BROOK, JJ. BIRD AND HALEY, dissenting.

SPEAR J,. While the report of the proceedings in this case is quite long and many questions of law and fact are raised by the relator, yet only three pertinent inquiries are involved.

The relator was elected and qualified as sheriff of Cumberland County for the term of office beginning January 1, 1913. On the second day of April following, the Senate and House of Representatives passed in concurrence the following resolve:

## "STATE OF MAINE.

"Resolve in favor of the adoption of an address to the Governor for the removal of Lewis W. Moulton, Sheriff for the County of Cumberland.

"Resolved, That both branches of the Legislature, after due notice given, according to the Constitution, will proceed to consider the adoption of an address to the Governor for the removal of Lewis W. Moulton, sheriff for the County of Cumberland, for the causes as following:

"First, because the said Lewis W. Moulton, who is now holding office of sheriff for the County of Cumberland, and who has held said office continuously since the first day of January, A. D. 1913, wilfully or corruptly refuses or neglects to perform the duties required of him as such sheriff by section sixty-nine of chapter twenty-nine of the Revised Statutes of this state as amended by chapter forty-one of the Public Laws of nineteen hundred and five, and particularly his duties as said sheriff in enforcement of the law against the illegal sale of intoxicating liquors and the keeping of drinking houses and tippling shops.

"Resolved, the House of Representatives concurring, that these resolutions and statements of causes of removal be entered on the journal of the Senate and a copy of the same be signed by the President of the Senate and served on said Lewis W. Moulton by such person as the president of the senate shall appoint for that purpose, who shall make return of such service upon his personal affidavit without delay, and that the first day of April, at eleven o'clock in the forenoon, be assigned as the time when the said Lewis W. Moulton may be admitted to a hearing in his defense."

This resolve, with the evidence of its service upon the relator, became the foundation of the hearing and subsequent request of removal, by address. Although the governor acted affirmatively, the attack here made is upon the regularity of the legislative, not the executive, action. The address reads:

"The Senate and House of Representatives in Legislature assembled present this address to the Governor and request the removal from office of Lewis W. Moulton, Sheriff of Cumberland County, for the causes following: Because the said Lewis W. Moulton,

who is now holding the office of sheriff for the County of Cumberland and who has held said office continuously since the first day of January, A. D. 1913, wilfully or corruptly refuses or neglects to perform the duties required of him as such sheriff by section sixty-nine of chapter twenty-nine of the Revised Statutes of this state, as amended by chapter forty-one of the Public Laws of 1905, and particularly his duties as said sheriff in enforcement of the laws against the illegal sale of intoxicating liquors and the keeping of drinking houses and tippling shops."

To the action of the Legislature, in moving and adopting the address, and of the governor in removing Sheriff Moulton, he has filed objections and assigned twenty-two causes of error in the proceedings.

But in view of the constitutional jurisdiction of the tribunal that initiated and concluded the proceedings, we are of the opinion that but three of the objections raised authorize or permit of consideration by the court.

If we now proceed to discover the jurisdiction assumed by the Legislature in this case, we find it conferred by Article IX, section 5 of the Constitution, and reads as follows: "Every person holding any civil office under this state, may be removed by impeachment, for misdemeanor in office; and every person holding any office may be removed by the Governor, with the advice of the council, on the address of both branches of the legislature. But before such address shall pass either house, the causes of removal shall be stated and entered on the journal of the House in which it originated, and a copy thereof served on the person in office, that may be admitted to a hearing in his defense."

By this provision it will be observed that the Legislature in address proceedings, is required to do three things: (1) state the causes of removal and enter them upon the journal; (2) serve notice on the person in office; and (3) admit him to a hearing. Otherwise than this there is no limitation upon the power of the Legislature in the conduct and determination of these proceedings. Whether address or impeachment should have been invoked is a question of interpretation and will be noted later.

It is not in controversy that the Legislature did the three things required. But the objection is that it did not do them right, and

consequently had no jurisdiction. It is the opinion of the court that the objection is not well taken. The address proceedings originated and proceeded under section 5, Article IX of the Constitution. It was a constitutional trial by a coördinate department of the government, the Legislature acting as a constitutional tribunal and limited in authority only by the language of Article IX, section 5. This limitation requires the assignment of causes, notice and hearing, in case of address, as jurisdictional facts. Accordingly the causes stated must be legal causes. The causes contemplated by the constitution can be neither trivial nor capricious. They must be such as specially relate to and affect the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public. They must be causes attaching to the qualifications of the officer, or his performance of his duties, showing that he is not a fit or proper person to hold the office. See "Cause," Words and Phrases, Vol. 2, 1009. It must also appear that the notice required is reasonable, and an opportunity afforded for a hearing.

Under this definition it would seem a sound conclusion that the causes stated in the resolution of address constituted a statement of legal causes within the contemplation of the constitutional requirement. To make the statement clear, it is necessary to repeat the causes stated, in connection with the statute cited, in order that the precise import of the causes may be fully understood. The resolution contains the following allegations: "First, because the said Lewis W. Moulton, who is now holding office of sheriff for the County of Cumberland, and who has held said office continuously since the first day of January, A. D. 1913, wilfully or corruptly refuses or neglects to perform the duties required of him as such sheriff by section sixty-nine of chapter twenty-nine of the Revised Statutes of this State, as amended by chapter forty-one of the Public Laws of nineteen hundred and five, and particularly his duties as said sheriff in enforcement of the law against the illegal sale of intoxicating liquors and the keeping of drinking houses and tippling shops."

The statute referred to, as amended, reads as follows: "Sheriffs and their deputies and county attorneys shall diligently and faithfully inquire into all violations of law, within their respective counties, and institute proceedings in case of violations or supposed

violations of law, and particularly the law against illegal sale of intoxicating liquors, and the keeping of drinking houses and tippling shops, gambling houses or places, and houses of ill fame, either by promptly entering a complaint before a magistrate and executing the warrants issued thereon, or by furnishing the county attorney promptly and without delay, with the names of alleged offenders, and of the witnesses. Any sheriff, deputy sheriff or county attorney, who shall wilfully or corruptly refuse or neglect to perform any of the duties required by this section, shall be punished by fine not exceeding one thousand dollars or by imprisonment not exceeding one year." The causes here assigned clearly and fully state a case of non-feasance, which is defined as "an omission to perform a required duty at all, or a total neglect of a duty; the omission of an act which a person ought to do." See "Non-feasance," Words and Phrases, Vol. 5, Page 4821. In fact the title of chapter 41, Public Laws, 1905, is "An Act providing penalties for non-feasance of duty by sheriffs," etc. Under the statute cited, there can be no question that non-feasance specially relates to and affects the administration of the office of sheriff, and is of a substantial nature directly affecting the rights and interests of the public; and, as such non-feasance is punishable by fine or imprisonment, it manifestly constitutes a charge of unfitness to hold office.

As the relator appeared with counsel and was fully heard in an exhaustive trial that lasted several days, no question can be raised as to notice or hearing. We can assume that these jurisdictional requirements are established, and hereafter in referring to jurisdiction it will be upon the assumption that these two requirements are settled.

But it is urged that the causes stated were not sufficiently specific to give jurisdiction. This is not a valid objection, for two reasons. (1) Because when legal causes are stated and entered upon the journal, there the constitutional limitation ends, and the legislative prerogative begins, so far as a statement of causes is concerned; and having acquired jurisdiction the Legislature may file further specifications or not as it may see fit. (2) Because the causes stated are in the language of the statute, as specific as the nature of the case will admit, and, we think, would sustain an indictment.

Under the first reason, as a matter of constitutional interpretation, it may be said, after the Legislature has properly observed the jurisdictional facts and thereby acquired jurisdiction of the case, that, beyond this, all matters of procedure, specification and detail, are left necessarily to the discretion of the Legislature, as acts of sovereign power, as no other way has been prescribed by the Constitution. It could not originate in the courts, nor are the courts given either original or appellate jurisdiction. It must be initiated by the Legislature; be tried by the Legislature; and determined by the Legislature.

This view, we think, is also substantiated by authority so far as the courts have had occasion to pass upon the issue. Necessarily this precise question has become a matter of judicial review but infrequently. In Massachusetts judicial officers may be removed by address, but neither charges, notice or hearing are required by the terms of the Constitution. In *Commonwealth* v. *Harriman*, 134 Mass., 314, it was held that the power of removal was absolute and could be exercised by the Legislature without limitation or restriction. It is there said: (1) "In confiding to the two coördinate branches of the government this important and exceptional power of removing the judiciary, the people found a sufficient protection to the substantial independence of the judicial department in the constitutional guaranties thrown around it, in the fact that the removal can only be made by the concurrent action of both houses of the legislature and of the governor and council, all of whom are directly answerable to the people at frequently recurring periods, and in the trust and confidence they may rightfully repose in their servants and agents that in the exercise of any power committed to them they will act in obedience to their oaths of office and in the spirit of the fundamental principles of the Constitution." (2) "When we consider the origin and history of the provisions, the obvious and natural meaning of its language, and the uniform practical construction which has been given to it, we are forced to the conclusion that the intention of the people was to entrust the power or removal of a judicial officer to the two coördinate branches of government without limitation or restriction. . . . The constitution authorizes the removal without any reason being assigned for it; and therefore it is wholly immaterial what evidence or causes

induced the legislature to vote the address." By a parity of reasoning, our Legislature, when it has once acquired jurisdiction, is supreme.

In New York is found a case which becomes a strong precedent for the interpretation herein presented. The case is In re Guden, Sheriff, N. Y. Appeals, 64 N. E., 451. This case was decided in 1902 under a provision of the New York Constitution, expressed in this language: "The governor may remove any officer in this section mentioned (sheriffs, clerks of counties, district attorneys, and registers in counties having registers,) within the terms to which he shall have been elected; giving to such officer a copy of the charges against him and an opportunity of being heard in his defense." With the exception that our constitution requires notice, as well as causes and opportunity to be heard, the phraseology of the New York constitution is in effect the same as ours; and, so far as the interpretation of the New York constitution bears upon the power of the governor to remove an officer, the two instruments may be regarded as identical, since the chief executive of a state, and the Legislature of a state, are each an equally independent department of the government and equally sovereign in the exercise of their respective powers. The language of the New York constitution is thus construed: "It does not require argument to persuade the mind that the power thus conferred is executive, not judicial; and that it was intended to be vested exclusively in the governor."

The New York case also becomes of peculiar strength upon this issue, since the question was raised by one of the Justices, who concurred in the result but dissented from the reasoning of the opinion, that the proceeding should be regarded as judicial and not as executive. But notwithstanding this contention, the court concluded as follows, C. J. Parker speaking for the court: "Therefore we do not examine into the merits, for they do not concern this court, as both the power to decide whether Guden should be removed from the office of sheriff and the responsibility for a right decision rest solely upon the governor of the state." This decision sustains the interpretation placed upon Article IX, section 5 as to the power thereby vested in the Legislature.

We have failed to find any other pertinent authorities. But, both upon reason and the authorities found, we are unable to avoid the conclusion that the Legislature, under the Constitution, in address proceedings, after it has acquired jurisdiction, is acting in the exercise of sovereign power, and is accountable only to the people for the manner in which it performs its functions.

But the relator contends that this proceeding should be regarded as judicial and governed by the established rules of law touching legal proceedings of a similar nature, and cites with confidence *Andrews* v. *King,* 77 Maine, 224. But the fallacy of this contention is its failure to differentiate between a sovereign tribunal like the Legislature, the executive or the judiciary, and a subordinate tribunal like a board of aldermen or other inferior body. So far as we have been able to note the authorities, this distinction is universally observed. *People ex rel* v. *Krulish & Fornes, et al.,* (N. Y. App.) 67 N. E., 210; *Meacham* v. *Common Council,* 62 N. J. Law, 302. See also *Sawyer* v. *Gilmore,* 109 Maine; *Tremblay et als.* v. *Murphy et als,* Maine, not yet reported. Nor do we find any text writer who disagrees with these conclusions. If, then, the Legislature has done the three jurisdictional things required by the Constitution, it is apparent that all the other objections become immaterial and require no further consideration.

The many other objections interposed by the relator are matters for the attention of the people and not for the action of the court.

Under the second reason we come to the sufficiency of the causes. While it is obiter dicta, it may yet throw some light upon this question, to review the causes in the light of criminal pleading. It will be observed that the causes for adopting the address are expressed in the language of the statute, with a further reference to, and therefore incorporation of, the whole statute under which they were made.

The way of stating the causes in the resolve is analogous, at least, to the rule of pleading which permits certain statute offenses to be set out, in an indictment or complaint, in the language of the statute. The causes specifically state that the relator "who has held office continuously since the first day of January, 1913, wilfully or corruptly refuses or neglects to perform the duties required of him as such sheriff by section 69 of chapter 29 of the Revised Statutes,

as amended by chapter forty-one of the Public Laws of nineteen hundred and five, and particularly his duties as said sheriff in enforcement of the law against the illegal sale of intoxicating liquors and the keeping of drinking houses and tippling shops. It will be observed that this statute, in the language of which, these charges were made is comprehensive, applying to a failure to enforce all statutes against the sale of intoxication liquors, and imposes a penalty upon any sheriff "who shall wilfully or corruptly refuse or neglect to perform any of the duties required by this section." The causes say that the relator did wilfully or corruptly refuse or neglect to perform the duties of his office in these regards. The sheriff is presumed to know the statute relating to the illegal sale of intoxication liquors and his duties touching its enforcement. *Commonwealth* v. *Ashley,* 2 Allen, 356; *Commonwealth* v. *Raymond,* 97 Mass., 567. In the latter case, it is said: "Under this clause, as under the laws against the sale of intoxication liquor or adulterated milk, and many other police, health and revenue regulations, the defendant is bound to know the facts and obey the law, at his peril. Such is the general rule where acts which are not mala in se are made mala prohibita from motives of public policy, and not because of their moral turpitude or the criminal intent with which they are committed. 3 Greenl. Ev., Sec. 21. *Commonwealth* v. *Boynton,* 2 Allen, 160; *Commonwealth* v. *Farren,* 9 Allen, 489; *Commonwealth* v. *Waite,* 11 Allen, 264."

No requirements of the statute could be better known to a sheriff than those which prescibe and define the different forms of offenses arising from violations of the prohibitory law. These various offenses have been upon the statute books for half a century and the particular injunction upon sheriffs to enforce the statutes under which the present charges were made, has been the law of this State for at least thirty years. And the plain object of the amendment of 1905 adding a penalty for non-feasance, was to prevent neglect or refusal by officers to enforce the law.

If, then, the sheriff was "bound to know the facts and obey the law," and he was, *Commonwealth* v. *Raymond,* supra, how could he be better or more fully informed of the offense with which he was charged?

It is the general rule that statutory offenses may be set out in general terms in the language of the statute or its equivalent. *State v. Robbins et al.,* 66 Maine, 324. In Ency. of P. & P. Vol. 10, Page 483, we find the following: "Language of Statute. (1) General Rules. While it is essential that all the facts constituting an offense must be so stated as to bring the defendant precisely within the law, it is a rule of universal application that when a statute creates an offense and sets out the facts which constitute it, the offense may be sufficiently charged in the language of the statute." Under Note 2 it is said: "This rule is so well known and universally accepted as hardly to require citation of authorities to support it." And a long list of cases from all the leading states of the Union is referred to in support of this doctrine. But the cases from Maine and Massachusetts seem to cover all the ground involved in this particular issue.

*State v. Casey,* 45 Maine, 435, is a case in which the indictment was for keeping a drinking house or tippling shop and was set out in the language of the statute of 1856, which read, "no person shall keep a drinking house or tippling shop within the state." The court say: "The only charge in the indictment is, that the defendant did, at the time and place named therein, 'keep a drinking house and tippling shop, contrary to the form of the statute.'" There is another section of the same statute, defining the offense, and providing that it shall consist of certain specified acts; and it is contended that this description should have been set out in the indictment. This is precisely what is claimed by the relator. After giving the general rule of criminal pleading, the court then states the rule in statute offenses: "But where the offense is prohibited in general terms in one section of the statute, and a penalty prescribed, and in another section, entirely distinct, there is a particular description of the elements which shall constitute the offense, we perceive no reason, upon principle or authority, why the indictment should contain anything more than the general description. That gives the defendant sufficient notice of the charge he is to meet, as effectually as if the whole description should be incorporated into the indictment." It will be observed that the statutory offence considered in the opinion and the statutory offence before us, in legal contemplation, are practically identical. Under the

latter statute "the offense is prohibited in general terms in one section of the statute and a penalty prescribed, and in other sections of the chapter, entirely distinct, there is a particular description of the different requirements of the statute, a refusal or neglect to enforce which, constitutes the offense."

*State* v. *Collins,* 48 Maine, 217, is another case in which the indictment charged that T. C. at a time and place named, "did keep a drinking house and tippling shop contrary to the form of the statute." Upon a motion in arrest of judgment the full opinion of the court reads: "In this case the indictment is sufficient. It is true that the prohibition, and the definition of the offense, by the statute of 1858, section 10, are in the same section. But the provisions are in distinct and separate clauses, as much as in the statute of 1858. In the case of *State* v. *Casey,* 45 Maine, 435, the word 'section' was used inadvertently in the opinion of the court, owing, probably, to the fact that, in the statute then under consideration, the provisions were in distinct sections. But whether in distinct sections, or clauses, can make no difference. The offense, like that of being a common seller of intoxicating liquors, is made sufficiently certain by the terms used in the enacting prohibitory clause." It should here be noted that the offense and the definition are in the same section. Yet the definition was not necessary.

*Commonwealth* v. *Ashley,* 2 Gray, 356, was an indictment in the language of the statute for keeping a house of ill-fame. The court say: "And we are of the opinion that this is a case in which the indictment so framed, is sufficient; because no allegation of anything more than these words, ex vi terminorum, import is necessary in order to show that the defendant has committed the statutory offense." We think the causes stated in the case before us come clearly within the reason here stated. The statute says: "Any sheriff . . . who shall wilfully or corruptly refuse or neglect to perform any of the duties required by this section shall be punished," etc., and the causes say that the relator did wilfully or corruptly refuse or neglect to perform these duties; no allegation of anything more than these words, ex vi terminorum, is necessary to show that the relator in the case before us has committed the statutory offense. Then the court states the rule: "According to the rule of pleading, laid down in 2 Hawk., c. 25, sec. 111, it is

sufficient, in an indictment, to pursue the very words of a statute, if by so doing the act, in the doing of which the offense consists, is fully, directly and expressly alleged, without any uncertainty or ambiguity. That is done in the present indictment."

In *Commonwealth* v. *Maloy,* 119 Mass., 347, the court states the rule in this way: "Where a statute embraces all the ingredients of the offense intended to be punished, and the language used described such offense with legal certainty, an indictment or complaint may well charge the offense in the words of the statute." In *Commonwealth* v. *Dyer,* 128 Mass., 70, the rule is stated in this language: "When an offense is created by statute, which sets forth with precision and certainty all the elements of the offense, an indictment or complaint is sufficient which charges the offense in the words of the statute." The statute in the language of which the present charge was made sets forth with precision and certainty all the elements of the offense with which the relator is charged, as the reading of the statute will clearly show, and the charges would seem to be sufficiently specific to sustain an indictment.

All these citations, it should be observed, relate to indictments or complaints for statute offenses, involving definite acts of misfeasance, where particular acts might well have been stated. Yet the general rule would seem to be well established that these offenses can be set in the language of the statute or its equivalent. But there is an exception to the rule, which we find clearly stated in *Commonwealth* v. *Barrett,* 108 Mass., 302. The rule and exception are stated as follows: "It is a general rule that, where an offense is created by statute, an indictment or complaint is sufficient which charges the offense in the words of the statute. *Commonwealth* v. *Raymond,* 97 Mass., 567. There is an exception to the rule, where the words of a statute may, by their generality, embrace cases falling within its literal terms, which are not within its meaning or spirit. In such cases, the offense intended to be made penal is ascertained by reference to the context, and to other statutes in pari materia, and the indictment or complaint must allege all facts necessary to bring the case within the meaning and intent of the legislature."

It will be observed that the words of the statute which we are considering are not general, but specific, alleging one specific offense

and no more. No other case could fall within its literal terms. No other charge could be brought under it. The only offense specified in this statute is a failure to act as the section commands; is a single, continuing, habitual offense; purely statutory; malum prohibitum; unknown to the common law; embraces a single charge,—non-feasance; and neither concerns nor is concerned with any other provision of the statute. It cannot be construed in pari materia nor with reference to the context. The meaning and intent of the Legislature is clear. It does not, therefore, come within the scope of the exception. But it is said the causes should have specified particular cases of refusal or neglect on the part of the relator; that, under the causes assigned, he was unable to know from what place in the county he would be called upon to confront the witnesses against him. But this claim, under the offense charged in this case, is specious rather than true. It should be here noted that the sheriff and his deputies are one in the enforcement of the laws and protection of the people against infraction of the laws, R. S., chap. 82, sec. 8, authorizes the sheriff to appoint deputies, "for whose official conduct and neglect he is answerable." The causes charge that he wilfully or corruptly refused or neglected to perform his duties as sheriff in enforcing the prohibitory law in the County of Cumberland over which his jurisdiction extended. Did he not know what he, himself, had done to enforce the prohibitory law? Enforcement is a specific, active performance of which the sheriff must have not only absolute knowledge but in most cases, record evidence. All it was necessary for him to do, when charged with non-feasance, covering a definite space of time, as in this case, was to bring forth his records of enforcement, from every part of the county covering the period, with all other evidence showing just what he had done, and his defense was all in. Because every search and seizure where a warrant is issued is of record; every nuisance case is of record; every drinking house and tippling shop prosecution is of record; every single sale procedure is of record; every charge for illegal deposit or keeping is of record. Every one of these various forms of prosecution, if instituted, was particularly within the knowledge of the sheriff, and not in the knowledge of the Legislature. Accordingly, the general charge of non-feasance covers every one of these offenses, and the answer to every charge

was absolutely within the knowledge, and easy procurement of the relator. The charge did not say, nor was it intended to say, that the relator had not enforced the law in particular towns or cities. nor could it be the whole truth. Within the intention of the causes required by the Constitution, it intended to say just what it did say, that the relator had not enforced the law in any particular town or city, nor anywhere else in the county; and this was the charge which he was required to meet, and which, as above seen, he had every facility, which the truth could afford, for refuting. There could be no surprise. His defense was simply to show what he had done. The causes assigned gave him notice to do this and nothing more. His field of defense was wide open. There was no restraint, technically or otherwise, upon it. It was open to him to show every search and seizure and every prosecution, advised or instituted by him or his deputies, under his orders, or without his orders, under the several forms of prosecution of the prohibitory law, which he is charged with refusing or neglecting to enforce. We are unable to discover how he could have been more fairly or more fully informed of the offense with which he was charged, than in the causes stated, or how he could have ever been better prepared to defend, than against this charge, where all the evidence, if any existed, had been the product of his own action and absolutely within his grasp.

We now call attention to the consideration that the offense of non-feasance, described in section 69, as amended, falls within a special line of decisions which are peculiarly adapted to this class of cases, touching the manner of pleading the charge. It will be readily seen that there is a marked difference between describing misfeasance and non-feasance; one a definite act which the law forbids; the other a failure to act, where the law commands an act. The former consists in doing something; the latter consists in doing nothing; in the former there is some act to specify; in the latter no act to specify. There is no act of any kind. There is habitual and continued omission to act; a course of conduct; a habit of wilful or corrupt refusal to perform the duties required by the statute. It is readily apparent that it is impossible to particularize a continual course of non-action. What a person does not do, can be described only in general terms, in a negative way.

Pertinent to this condition of things is *Commonwealth* v. *Pray,* 13 Pick, 359, in which the caurt say: "Wherever a crime consists of a series of acts, they need not be specially described, for it is not each or all the acts of themselves, but the practice or habit which produces the principal evil and constitutes the crime." Then follows several cases as illustrations of this rule, one of which seems to be peculiarly pertinent, for it involves neglect. It is said: "It is made the duty of towns to keep in repair highways within their limits; and for a neglect of this duty they are liable, not only to indictment, but if any individual injury occurs by rea- son of it, to a civil action. In indictments and declarations of this statute, which are of almost daily occurrence, the practice has never been to set forth minutely the defects of the highway. But a gen- eral allegation, that a certain highway is out of repair, ruinous and unsafe, has always been deemed sufficient." The same rule is found in *Stratton* v. *Commonwealth,* 10 Metcalf, 217, the court saying: "We have no doubt, in looking at the present case, that from the very nature of the offense here charged, it being not a particular act, but a continual series of acts or habit of life, that constitutes the offense of being a common railer and brawler, it is properly set forth by the same general description of the crime charged, that would be good in case of the common barrator or common scold."

We have thus far considered the specification in the light of the charges necessary to be set out in an indictment or complaint. But it was not incumbent on the Legislature, under Article IX, section 5, to observe the same particularity required in an indictment. In re Guden, supra. Throop Pub. Off., section 389; *Burt et al.* v. *Iron County,* 108 Mich., 523; Cyc., 29, 1409 d. note 26; *Andrews* v. *King,* 77 Maine, 224.

We now come to another objection to the action of the Legis- lature, namely: "That the removal of officers by address under section 5 of Article IX of the Constitution did not contemplate the removal of the officer for official misconduct." If this contention could be established, the action of the Legislature in the case before us would, of course, be void. It would be without jurisdiction under the Constitution. But the contention is untenable. Where this question has been passed upon by the courts, it has been held

by all the authorities, so far as we have been able to discover, that the removal of officers by impeachment for misconduct in office was not an exclusive method, but concurrent with other methods of removal which might be provided for the same cause. Throop on Public Officers, section 400. In *Commonwealth* v. *Harriman,* already cited, this issue was sharply raised and exhaustively considered by the court. Not only is the provision of the Constitution, authorizing impeachment and address, carefully considered, but the history of the events both in England and Massachusetts, which led up to the adoption of the provision, is reviewed. The opinion states the contention of the defendant as follows: "The principle ground upon which he founds his claim is that the charges upon which he was removed were charges of misconduct and mal administration in office, for which he was liable to impeachment, and that the constitutional power of removal by address does not include the power to remove for offenses which are impeachable. This question is an important one." But this contention was overruled as follows: "The language is broad and general, in its terms it includes a removal for any cause which is deemed by the Legislature and executive departments sufficient. If it had been intended to exclude from this provision the power to remove for misconduct in office, leaving that to be dealt with by impeachment exclusively, it would have been so stated. Neither this article nor the article on impeachment contains any indication that the power of impeachment was to exclude the power of removal by address. We must give to the proviso the broad meaning which its language imports." The language in our Constitution is equally broad and general, as a comparison will show.

It hardly seems possible that the framers of the fundamental law upon this subject could have used language so loosely as the construction of the relator would seek to imply. On the other hand, it rather seems to us that the language is so plain that it is difficult to see how any rules of construction can apply other than the fundamental rule "that words and phrases should be construed according to the common meaning of the language."

A single point remains to be considered, a point raised neither by the pleadings nor in argument. It nevertheless should be examined.

It is contended that, as the constitutional amendment, commonly known as the initiative and referendum, adopted by the people under chapter 121 of the Resolves of 1907 provided in section 16 that "no act or joint resolution of the legislature, except such orders and resolutions as pertain solely to facilitating the performance of the business of the Legislature, etc., shall take effect until ninety days after the recess of the legislature passing it unless in case of emergency," etc., and as the address proceedings in the case originated in a joint resolution of the Legislature, it follows that this resolution could not take effect until the expiration of ninety days from adjournment. This would permit the securing of a written petition containing at least ten thousand names, addressed to the Governor, requesting that the resolve be referred to a popular vote and would thereby suspend the effect of the resolution until ninety days after the Governor shall have announced by public proclamation that the resolution has been ratified by a majority of the electors voting thereon at a general or special election. Section 17.

In other words, it is claimed that address proceedings for the removal of a public officer are, under the constitutional amendment providing for a referendum, held up at the very inception because the resolution on which they are based cannot in any event take effect until ninety days after adjournment.

Can this be so? In our opinion such a contention is without foundation.

It seems to proceed upon the theory that merely because the word "resolution" or "resolve" is used in the constitutional amendment, and a resolution was adopted by the legislature as the basis of these proceedings, the court has no power to construe these terms, cannot distinguish between them but must blindly accept the word resolution in both cases as having the same meaning.

It is, however, a fundamental duty of the court and within its exclusive province to construe both statutes and the Constitution and to ascertain not only from the words themselves but from the context, from the purpose to be sought, and in some cases from the result attending upon one construction or the other, what the real intention of the law making power was and how the expressed intention should be interpreted. This principle is too familiar to require the citation of authority.

The precise question for the court to determine on this branch of the case, therefore, is whether the joint resolve which was the first step in these address proceedings was such a resolve as is within the scope or contemplation of the referendum. This question must be answered in the negative.

The fallacy of the claim lies in the failure to distinguish between the Legislature as a law making body and the Legislature as an impeaching or addressing body. In the former capacity it is performing the usual function of any legislative assembly, in the latter it is exercising the unusual powers expressly conferred upon it by the Constitution, powers somewhat akin to those of a judicial tribunal. The two are absolutely distinct and the referendum applies to the one but not to the other.

This legislative power is specified and defined in Article IV of the Constitution, which, in part first, treats of the House of Representatives as one branch of the Legislature, in part second, of the Senate as the other, and in part third, of the Legislature as a whole, composed of both branches.

It is this Article IV which in express terms is amended by the resolve creating the initiative and referendum, Resolves, 1907, chap. 121, and it is the only article in the Constitution that is thereby amended.

Section 1 of part first of Art. IV is amended by striking out the words "the style of their laws and acts shall be 'Be it enacted by the Senate and House of Representative in Legislature assembled'" and inserting in place thereof "but the people reserve to themselves power to propose laws and to enact or reject the same at the polls independent of the legislature, and also reserve power at their own option to approve or reject at the polls any act, bill, resolve or resolution by the joint action of both branches of the legislature, and the style of their laws and acts shall be 'Be it enacted by the people of the state of Maine.'"

Then follows the amendment to section 1 of part third of Article IV so as to read "The legislature shall convene on the first Wednesday of January, biennially, and, with the exception hereinafter stated, shall have full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this state, not repugnant to this constitution nor to that of the United States."

And finally come the various sections, numbers 16 to 22, which provide for the initiative and referendum and which are made additional to part third of Article IV, that part, before amendment, consisting of fifteen sections only.

The purpose and scope of these amendments are obvious. The design was to have the legislative power not final but subject to the will of the people, a will to be called into exercise by the somewhat complicated machinery of the referendum. Before amendment "their laws and acts" bore the title of "Be it Enacted by the Senate and House of Representatives in Legislature assembled." Since amendment the title has been "Be it enacted by the People of the State of Maine," the people and not the Legislature being the real arbiters of the laws to be finally accepted. That is, the central idea of the change was to confer the law making power in the last analysis upon the people themselves, a step from representative toward a democratic form of government. This, too, marks the limitation of the amendment. It applies only to legislation, to the making of laws, whether it be a public act, a private act or a resolve having the force of law.

This is shown clearly and conclusively by the language of sec. 2 of part third of Article IV, under the general head of "legislative power." "Every bill or resolution *having the force of law* to which the concurrence of both houses may be necessary . . . which shall have passed both houses, shall be presented to the Governor, and if he approve, he shall sign it," etc. The referendum applies and was intended to apply only to acts or resolves of this class, to *"every bill or resolution having the force of law,"* that is, to what is commonly known as legislative acts and resolves, which are passed by both branches, are usually signed by the governor and are embodied in the Legislative Acts and Resolves, as printed and published. And the words "No act or joint resolution of the Legislature," etc., before quoted, in the referendum amendment must be construed in the light of the context, considering all the sections and parts and articles together, as meaning "no act or joint resolution of the legislature having the force of law." This is the simple and plain interpretation of simple and plain language.

So much for the Legislature as a law-making body and for the class of acts and resolves covered by the referendum.

Now let us turn to another and distinct power lodged with the Legislature by the Constitution, that of preparing an address to the Governor for the removal of a public officer. This power is conferred not under Article IV, before considered, the article which was amended by the referendum, but under a distinct provision, viz.: Section 5 of Article IX, the article being entitled "General Provisions," and covering a wide variety of subjects. Section 5 reads: "Every person holding any civil office under this State, may be removed by impeachment for misdemeanor in office; and every person holding any office may be removed by the Governor, with the advice of the Council on the address of both branches of the Legislature." . This section remains unrepealed and unamended. The referendum amendment did not refer to it and did not affect it. Under this section and within this distinct category falls the resolution in the case at bar. It was passed by the Legislature in no sense as a legislative act, as a law nor as a proposed law, but was rather in the nature of a complaint in a criminal proceeding. It was the first step in setting in motion the machinery of removal, and in the exercise of an extraordinary power conferred upon one of the three great departments of government, but entirely apart from the ordinary powers of legislation as such. It was a resolution, or vote or expressed determination to proceed to the trial of a public officer. It preceded the trial itself, was preliminary to it, and the logical conclusion of the theory of the contention is that as this resolution could not become effective until at least the expiration of ninety days from the adjournment of the Legislature, the subsequent trial whether held or not, and its outcome whether favorable or not to the accused, would be wholly immaterial since the people have the right to determine whether the resolution should be effective and any trial at all held. This, of necessity, would work a repeal of so much of section 5 of Article IX as relates to address proceedings and would effectually deprive the Legislature of the power thereby expressly conferred, because if no resolve of this nature can take effect until the expiration of at least ninety days after adjournment, and perhaps not even then, the Legislature, the constitutional tribunal, would then have ceased to be in session and no trial could be had at all. In effect this would be an attempted

transfer of the proceedings for removal of a public officer from the Legislature to the people at large and would effect an impracticable and quite impossible species of recall.

It is almost inconceivable that such a revolutionary result could have been within the contemplation of the Legislature that in the first instance submitted to the people the referendum amendment, or within the contemplation of the people who adopted it. If such was the purpose, section 5 of Article IX would itself have been amended, and by no reasonable stretch of judicial power can the express amendment of Article IV, the legislative power, be construed to work an implied amendment and practical repeal of section 5 of Article IX, the address power.

It is impossible for a majority of the court to accede to the doctrine of the relator's contention on this point. On the contrary, we hold that the power of the Legislature to recommend the removal of a public officer by address still abides unshorn, as it has existed since the adoption of our constitution in 1820, that this important safe-guard of public welfare was neither repealed nor abridged by the adoption of the initiative and referendum, and therefore that the resolve in the case at bar became effective upon its adoption.

From a parliamentary point of view, it seems clear that the address resolve did not come within the referendum amendment. Article IX, section 5 confers upon the Legislature a special jurisdiction. It will be conceded that each equal and coördinate department of government is sovereign within its sphere of action and may determine its own rules of procedure. Jefferson's Manual holds that each branch of Congress was authorized "to determine the rule of its own proceeding." This rule has been adopted by all legislative bodies so far as we are aware and is in force today. Parliamentary rules of order everywhere make use of the word "resolve" as the most apt in serving the legislative purpose, whether national or state. When the Legislature commands, it is by an order; but when it gives expression to a fact, a principle, its own opinions and purposes, it is expressed in the form of a resolution which, through parliamentary usage, has become conventional. But there is a clear distinction between such resolves and those having the force of law. The present resolve was "in favor of the adoption of an address to the governor" as provided in Article IX,

Section 5, the performance of a special duty, in a certain special manner. In other words, the resolve raised the question whether the Legislature should, in that instance, vote to take action on a case within its special jurisdiction. It was the only practical way to get an expression of opinion of the legislative body, to ascertain the legislative will, and its determination to do or not to do the thing proposed. Every move related to instituting the proceeding under its special jurisdiction; and the resolve, which was the conventional way, or some other form of expression, was a necessary step in the premises required by Article IX, and had no greater signifi-- cance than, "shall the main question be now put," or a "demand for the previous question" or "that the bill providing for removal by address be made a special order for a day certain." Inasmuch as Article IX, section 5 was not amended in terms and provides for the removal of officers by address, it seems conclusive that the resolve was but the parliamental instrumentality by which the Legislature set in motion the wheels of its special power.

Again, if the referendum applies to Article IX, section 5, so does the initiative with equal force and we find ourselves confronted with the astounding situation never before suspected, either by the Legislature which passed the referendum amendment, the governor who signed it, or the people who voted for it, namely, a recall of every officer named in Article IX, section 5 by a popular petition to the Legislature of not less than twelve thousand electors.

It might with propriety be added, that up to the present time this has been the universally accepted view. It is a matter of pub- lic knowledge that the Legislature of 1911 adopted similar pro- ceedings in addressing the governor on the removal of a public official and the official was removed. Neither the members of that Legislature, nor the eminent counsel employed nor the public gen- erally even conceived of the idea that the removal was void because the preliminary resolve was within the referendum amendment and therefore had never taken effect.

In the case at bar the eminent and learned counsel for the relator assigned in their information no less than twenty-two distinct causes of error and in their able and comprehensive brief set forth seven grounds for holding the removal illegal, but that of the refer- endum is not found among them.

While the absence of such a claim on the part of those charged with the management of so important a cause as this is, of course, not conclusive as to its lack of merit, yet its omission, to say the least, must be regarded as significant.

Upon full consideration of the whole case, it is the opinion of a majority of the court, that the relator was lawfully removed from the office as sheriff of Cumberland County, and the entry must, therefore, be,

*Information dismissed with costs.*

HALEY, J. Dissenting. Lewis W. Moulton, the relator, at the election of September, 1911, was elected sheriff of the County of Cumberland, duly qualified as required by law, and entered upon the discharge of the duties of his office at the expiration of his former term. He thereby became the de jure sheriff of said county for the term beginning January 1, 1913, and ending December 31, 1915, and performed the duties of that office until May 8, 1913, on which day the respondent assumed the office, and continued to perform the duties of sheriff of said county until the filing of the petition in this case.

The respondent claims the office as sheriff by virtue of the following action of the Legislature and the Governor and Council: On the second day of April, 1913, this Resolve passed both branches of the Legislature, but not by a vote of two-thirds of all members elected to each house.

"STATE OF MAINE.

"Resolved in favor of the adoption of an address to the Governor for the Removal of Lewis W. Moulton, Sheriff for the County of Cumberland.

"Resolved, That both branches of the legislature, after due notice given, according to the Constitution, will proceed to consider the adoption of an address to the Governor for the removal of Lewis W. Moulton, sheriff for the County of Cumberland, for the causes following:

"First, because the said Lewis W. Moulton, who is now holding the office of sheriff for the County of Cumberland, and who has

held said office continuously since the first day of January, A. D 1913, wilfully or corruptly refuses or neglects to perform the duties required of him as such sheriff by section sixty-nine of chapter twenty-nine of the Revised Statutes of this State as amended by chapter forty-one of the Public Laws of nineteen hundred and five, and particularly his duties as said sheriff in enforcement of the law against the illegal sale of intoxicating liquors and the keeping of drinking houses and tippling shops.

"Resolved, The House of Representatives concurring, that these resolutions and statements of causes of removal be entered on the Journal of the Senate and a copy of the same be signed by the President of the Senate and served on said Lewis W. Moulton by such person as the President of the Senate shall appoint for that purpose, who shall make return of said service upon his personal affidavit without delay, and that the first day of April, at eleven c'clock in the forenoon, be assigned as the time when the said Lewis W. Moulton may be admitted to a hearing in his defense."

Upon the same day notice and summons were served upon the relator, notifying him to appear before a joint convention of the members of the Seventy-sixth Legislature to answer to the charges set forth in said Resolve; on April 5, 1913, the Legislature proceeded to the hearing upon the resolve, and on the ninth day of April, 1913, both branches of the Legislature concurred in passing an address to the Governor, requesting the removal of the relator from the office of sheriff of Cumberland County for the causes set forth in said resolve. On the twenty-fourth day of April, 1913, the Governor's Council voted to advise the Governor, and consented to the removal of the relator from the office of sheriff of Cumberland County. On the twenty-eighth day of April the Governor of the State notified the relator that, in pursuance of the address of both branches of the Legislature, and with the advice of the Council, he, the relator, had been removed from the office of sheriff of Cumberland County, which removal was to take effect May 8, 1913, and on the same day Everett G. Scully, the respondent, was nominated as the successor to the relator in said Office and duly qualified as sheriff, and on said eighth day of May assumed the office of sheriff of Cumberland County and held the same until the beginning of the proceedings in this case.

The proceedings were claimed to be under Article IX, section 5, of the Constitution of Maine, which reads:

"Every person holding any civil office in this state may be removed by impeachment, for misdemeanor in office, and every person holding any office, may be removed by the Governor, with the advice of the Council, on the address of both branches of the Legislature. But before such address shall pass either house, the causes of removal shall be stated, and entered on the journal of the house in which it originated, and a copy thereof served on the person in office, that he may be admitted to a hearing in his defence."

First, The last paragraph of the above quoted section of the Constitution, by virtue of which the proceedings were held, provides: "But before such address shall pass either house, the causes of removal shall be stated, and entered on the journal of the house in which it originated, and a copy thereof served on the person in office, that he may be admitted to a hearing in his defence."

Those provisions were a constitutional restraint upon the Legislature, and, unless complied with, the Legislature had no jurisdiction to pass the address relied upon by the respondent. It always has been, and always will be, in all governments of law, necessary for any court or body of men, before they can render a valid judgment against any person, to have jurisdiction of that person, for without jurisdiction the proceedings of any body is void, and the acts of any court or body of men that are contrary to the Constitution are acts beyond their jurisdiction and are void.

It does not seem necessary to decide whether the Legislature, during these proceedings, were acting judicially, or in the discharge of its legislative functions, but I do not think that *Commonwealth* v. *Harriman,* 134 Mass., 314, gives any support to the claim that the proceedings were legislative. The Constitution of Massachusetts, which was construed in that case, gives the Governor power, upon address of the Legislature, to remove judicial officers. It does not provide, as the Maine Constitution does, for entry upon the journal, notice and a copy of the charges and an opportunity to make a defense, and, as that Constitution does not provide for them, the Legislature in the address proceeding was not bound to do anything,

except as provided for by the Constitution, and, without those or similar provisions, the proceedings would necessarily be legislative.

"The legislature are powerless in any attempt to legislate in violation of, or inconsistent with, constitutional restraints. And when, if ever, the executive or legislative departments have exercised in any respect a power not conferred by the constitution, on a proper submission of the questions arising thereon, we have seen that the judiciary is not only permitted but compelled to sit in judgment upon such acts, and bound to pronounce them valid or otherwise. . . .

"Nor does the conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and when the will of the Legislature stands in opposition to that of the people, declared in the constitution, the judges ought to be governed by the latter, rather than the former. They ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental.

"When the acts of the legislature and the executive departments are found upon full consideration to be inconsistent with this fundamental law, and are so pronounced by that department entrusted with the power and compelled in duty to do so, these acts are simply void. The law, which operates upon all from the highest to the lowest, is made known, and all affected thereby, submit, not to the court, which announces the result of the question presented, but to the majesty of the law which is omnipotent." Davis case, 41 Maine, 38; Opinion of Justices, 70 Maine, 609.

The court can always inquire with reference to the question of jurisdiction, and the power to inquire as to jurisdiction necessarily implies the right to examine into the nature and character of the causes set forth, in order to see whether they are in any proper sense charges within the meaning of the Constitution.

To acquire jurisdiction is was necessary that the charges should have been entered in the journal of the house in which they originated, and a copy thereof served upon the relator, and those charges should have been specific enough to comply with the provisions of the Constitution. If they did not comply with the Constitution, the Legislature did not acquire jurisdiction, and the proceedings are void.

If the Legislature had passed the address without entering the charges upon the journal of the house in which they originated, the proceedings would have been unconstitutional and void, and if the Legislature passes an address, first entering upon the journal of the house in which the proceedings originated, charges that are not in compliance with the requirements of the Constitution, the proceedings were unconstitutional and void.

Before the Legislature acquired jurisdiction, the relator was entitled to have spread upon the journal of the house in which the proceedings originated, the charges against which he was to be given an opportunity to defend himself. The charges of course need not be as specific as in criminal or civil pleadings, but should give him notice that would enable him to make his defense.

The purpose of the provisions is that the officer to be addressed may have an opportunity to make his defense to the charges that are a matter of record. The charges should be so specific that he may know what testimony to produce at the hearing. If charges are so drawn that the officer sought to be addressed cannot tell what evidence to adduce to disprove them, and the Legislature and court hold the charges sufficient, they in effect hold that the provisions of the Constitution are of no effect.

Chapter 41 of the Public Laws of 1905, reads:

"Sheriffs and their deputies and county attorneys shall diligently and faithfully inquire into all violations of law, within their respective counties, and institute proceedings in case of violations or supposed violation of law, and particularly the law against illegal sale of intoxicating liquors, and the keeping of drinking houses and tippling shops, gambling houses or places, and houses of ill fame, either by promptly entering a complaint before a magistrate and executing the warrants issued thereon, or by furnishing the county attorney promptly and without delay, with the names of alleged offenders, and of the witnesses. Any sheriff, deputy sheriff or county attorney, who shall wilfully or corruptly refuse or neglect to perform any of the duties required by this section, shall be punished by fine not exceeding one thousand dollars or by imprisonment not exceeding one year."

Were the charges in the Resolve so specific that the relator could intelligently make his defense? If they were not, the Legislature had no jurisdiction. No particular act, or neglect to act, is set

forth.  It is urged that the causes set forth in the Resolve are sufficiently specific to sustain an indictment, and, if they are, the constitutional restraint was complied with.  An examination of the elementary rules of criminal pleading shows the position to be unsound.  In *Armour Packing Co.* v. *U. S.*, 153 Fed. 1, Sanborn, Circuit Judge, states the rule as follows:  "Where a crime is a statutory one, the indictment must set forth with clearness and certainty every essential element of which it is composed.  It must portray the *facts* which the pleader claims constitutes the alleged transgression so distinctly as to advise the accused of the charge which he has to meet, and to give him a fair opportunity to prepare his defense so particularly as to enable him to avail himself of a conviction or an acquittal in defense of another prosecution for the same offense, and so clearly that the court may be able to determine whether or not the *facts* there stated are sufficient to support a conviction."  And many cases are cited in support of the rule as above stated.

In *State* v. *Doran,* 99 Maine, 331, the court say:  "In all criminal prosecutions the accused shall have a right to demand the nature and cause of the accusation.  Cons. of Maine, Art. I, sec. 6.  He has a right to insist that the *facts* alleged to constitute a crime shall be stated in the indictment against him with that reasonable degree of fullness, certainty and precision requisite to enable him to meet the exact charge against him, and to plead any judgment which may be rendered upon it in bar of a subsequent prosecution for the same offense."

In *State* v. *Lynch,* 88 Maine, 195, the court say:  "But the question is whether the accusation is set forth with sufficient particularity and certainty to inform the accused of the offense with which he is charged, and to enable the court to see, without going out of the record, what crime has been committed, if the *facts* alleged are true."

An indictment against a sheriff for violation of the law of 1905, to comply with the above rules, should contain the positive averment that he did wilfully and corruptly refuse and neglect to diligently and faithfully inquire into violations of the law against the illegal sale of intoxicating liquors, and the keeping of drinking houses and tippling shops, and (1) to institute proceedings against the violators by wilfully and corruptly refusing and neglecting to

enter complaints before a magistrate, (2) and to execute the warrants issued on said complaints, or, (3), in the language of the statute, "wilfully and corruptly refuse to furnish the county attorney, promptly and without delay, the names of the alleged offenders and of the witnesses," and should also state the names of the offenders and the places where the crime was claimed to have been committed. The charge in the Resolve does not set forth with clearness and certainty every essential element of which the crime is composed. It does not portray the facts which constitute the alleged crime distinctly so as to advise the accused of the charge which he is to meet, and to give him a fair opportunity to prepare his defense.

Neither do the causes set forth in the Resolve follow the language of the statute, which is permissible in some cases, but not in the offense described in the statute under discussion. In *Commonwealth* v. *Raymond,* 97 Mass., 567, cited in the opinion, the indictment alleged, in the language of the statute, that the defendant killed a calf less than four weeks old, with intent to sell the same, and the indictment was held good because all the facts necessary to constitute the crime as set forth in the statute, viz., the killing of the calf less than four weeks old and the intent were alleged. There are no facts necessary to constitute the crime created by chapter 41 of the Laws of 1905 set forth in the Resolve in question. In *Commonwealth* v. *Barrett,* 108 Mass., 302, cited in the opinion, an indictment against an inhabitant of the state, by previous appointment going out of the state, and engaging in fight, the indictment alleged all the facts that the statute prescribed to constitute the crime, and the courts say: "Where the statute sets forth with precision and certainty all the elements necessary to constitute the offense intended to be punished, an indictment or complaint is sufficient which uses the words of the statute." The causes assigned in the Resolve in this case do not set forth with precision and certainty all the elements necessary to constitute the offense intended to be punished. It does not set forth any of the facts and does not use the words of the statute necessary in charging the offense attempted to be set forth.

And it is not sufficient, even, to use the words of the statute unless they contain a reasonably particular statement of all the essentials

which constitute the intended offense. In *State* v. *Lashus,* 79 Maine, 541, Virgin, J., says. "But such a mode of setting out a violation of a penal or criminal statute is not necessarily sufficient. *State* v. *A. & D. R. R. Co.,* 76 Maine, 411 ; *Com.* v. *Pray,* 13 Pick., 359. The law affords to the respondent in a criminal prosecution such a reasonably particular statement of all the essential elements which constitute the intended offense as shall apprize him of the criminal act charged ; and to the end, also, that if he again be prosecuted for the same offense, he may plead the former conviction or acquittal in bar." To the same effect is *State* v. *Singer,* 101 Maine, 299.

The crime attempted to be set forth in the Resolve is not one that consists of a series of acts that need not be particularly described, as a brawler, common scold, the keeping of a drinking house and tippling shop, or a common seller of intoxicating liquors.

In those cases the statute makes the continued act a crime. The acts themselves may be crimes, as the sale of liquor drank upon the premises would render the seller liable for a single sale, and a series of the acts would make him guilty of maintaining a drinking house and tippling shop, which is a different crime than each of the acts. The statute under discussion makes each of the prohibited acts a crime, but does not make a series of acts a different crime, or continuous acts a crime, and therefore the acts necessary to constitute the crime should be set forth. As the charges set forth in the Resolve do not set forth with precision and certainty all the elements necessary to constitute the offense, and do not set forth the alleged offense in the language of the statute, and as the offense created by the statute does not consist of a series of acts, but consists of single prohibitive acts, the charges cannot be held sufficient to sustain an indictment without disregarding the elementary rules of law enforced by the courts for centuries to protect persons accused of crime.

Could the relator tell what act, or neglect to act, he should be prepared to disprove? None are set forth in the Resolve. To defend the charges it would be necessary to prove, not only the efforts made by the sheriff and his deputies in all the cities and towns in the county, but also the complaints made by them against alleged

offenders in all the cities and towns in the county, and also of the lists furnished by the sheriff and his deputies of the persons claimed to have been violating the law in the county, to the county attorney together with the names of the witnesses; also to produce witnesses from all cities and towns in the county, showing how the law was enforced in those places, as to whether the sheriff or his deputies were diligent in the enforcement. Could the relator tell whether to take witnesses from the town of Brunswick, or from the town of Scarboro many miles distant, or from Harrison, or the island wards of Portland sixty miles away? How could he tell from which of the twenty-three cities and towns in the County of Cumberland to take witnesses to the Legislature? To have been prepared to disprove the charges, if they were sufficiently set forth, he would necessarily have been obliged to have taken many witnesses from each city and town in the county, and the expense of taking a sufficient number of witnesses from each city and town in the county to Augusta, and keeping them there for a hearing, would bankrupt any sheriff in the State, and it was to protect officers from such hardships that a constitutional restraint upon the Legislature was imposed by the people.

In re Guden, Sheriff, 171 N. Y., 529, the court decided that the Governor in the hearing and removal was acting in an executive capacity and not in a judicial capacity; but the case shows that the charges upon which the Governor acted were specific; that the respondent was charged with giving, or farming out, to a committee the appointment of his deputies. The specific act was charged and the respondent had an opportunity of disproving that charge, and that case would seem to sustain the contention of the relator that the charges should be specific.

Charges as indefinite as to acts and time and place, as charged in the Resolve, are not a compliance with the Constitution. It is not right that a constitutional restraint for the protection of persons holding office should be so construed as to deprive them of the protection intended. It being a constitutional question, this court should rule whether the charges recorded in the journal of the house by the record of the resolve in question are such charges as the Constitution provides for, and that, as the charges are not

certain enough for the relator to be able to intelligently make his defense, they are not charges such as are required by the Constitution, and therefore the Legislature was constitutionally restrained from taking the action it did, and their proceedings in passing the address void.

Second. Part first of Article IV of the Constitution was amended by resolve approved March 20, 1907, so as to read: "The legislative power shall be vested in two distinct branches, a house of representatives and a senate, each to have a negative on the other and both to be styled the Legislature of Maine, but the people reserve to themselves power to propose laws and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act, bill, resolve or resolution passed by the joint action of both branches of the Legislature. . . . Part three of Article IV of the Constitution was amended at the same time so that part of section 16 now reads: "No act or joint resolution of the Legislature, except such orders or resolutions as pertain solely to facilitating the performance of the business of the Legislature, of either branch, or of any committee or officer thereof or appropriate money therefor, or for the payment of salaries fixed by law, shall take effect until ninety days after the recess of the Legislature passing it, unless in cases of emergency, (which with the facts constituting the emergency shall be expressed in the preamble of the act), the Legislature shall, by a vote of two-thirds of all the members elected to each house, otherwise direct," and further provides what an emergency bill shall include.

"It is a common course of proceeding, for the house to agree to certain resolutions, either reported by a committee, or introduced by a member, as the basis of proceedings to be afterwards instituted, in the form of an address, impeachment, or bill; in which case, the practice is to refer the resolutions to a committee for the purpose of being put into proper form. Resolutions of this description are sometimes made the joint act of both branches, by being first agreed to in one branch, and then sent to the other for its concurrence." Cushing's Legislative Proceedings, sec. 800.

The Resolve under which the proceedings complained of were held, was, in the language of the Constitution, "a resolve" or "reso-

lution" passed by the joint action of both branches of the Legislature, and one upon which the people reserved the power, at their option, to approve or reject at the polls. The language of the Constitution is, "to approve or reject at the polls any act, bill, resolve or resolution." It was a joint resolution that did not pertain solely to facilitating the performance of the business of the Legislature, or either branch, or any committee or officer thereof, or appropriate money therefor, or for the payment of salaries fixed by law, because it related to a hearing in which the relator was vitally interested. Nor was it an emergency bill. The Constitution provides causes for which emergency bills may be passed, and this was not one of them, and it did not express in the preamble the facts constituting an emergency, and, unless the preamble did contain such facts, then, by the Constitution, it was not an emergency bill.

The resolution was the basis of the address, and without it the provisions of the Constitution, under which the proceedings were held, were not complied with. I refer to the entering upon the journal of the charges against the relator, and of the furnishing to him a copy of the charges and the opportunity to make his defense, for, unless those things were done, the address and the attempted removal by the Governor were clearly in violation of the Constitution. The resolution would have served that purpose but for the amendment; but the amendment provides that no joint resolution (this was a joint resolution passed by both branches of the Legislature) shall take effect until ninety days after the recess of the Legislature. If the resolve did not take effect until ninety days after the recess of the Legislature, an address founded upon the resolve that had not taken effect could not be passed, or, if it could be passed, it could not take effect until the resolve upon which it was based took effect.

After the resolve had passed both branches of the Legislature, it was then for the people to exercise their option of approving or rejecting at the polls the action of the Legislature, within ninety days after the recess of the Legislature. That constitutional right was ignored, before the adjournment of the Legislature, by the passing of the address which was based upon the resolve, and before the ninety days reserved by the Constitution for the people to

exercise their option of deciding at the polls whether they would approve or reject the resolution as passed, by the Governor, with the advice of the Council, attempting to remove the relator from the office to which he had been elected by the people. As the resolve had not taken effect at that time, and as all of the proceedings upon which the address was based were proceedings upon that resolution, the action of the Governor and Council in giving effect to the reso-lution before the expiration of the time in which the people had the right to exercise their option of whether they would approve or reject at the polls, was contrary to the Constitution.

We must not forget that a Constitution is the measure of the rights delegated by the people to their governmental agents, and not of the rights of the people. The question for the court to determine upon this branch of the case is, whether the joint resolve, which was the first step in the address proceedings, was such a resolve as is within the scope or contemplation of the referendum; but it should be remembered that the Constitution is the will of the people, that the amendment to the Constitution is the latest expression of the will of the people, and that in amending the Constitution it is not necessary to express a repeal of parts inconsistent with the amend-ment, all parts inconsistent are repealed by the amendment, as said by the court in *State* v. *Langsworthy,* 55 Oregon, 303, in consider-ing the initiative and referendum provision of their Constitution. although upon a different subject matter, "it must be kept in mind that the addition of this amendment to our organic laws necessarily carried with it all powers essential to make its provisions effective, and any part of the Constitution previously in force, so far as in conflict or inconsistent therewith, was by its adoption necessarily repealed," and the argument that sections of the Constitution were not repealed by amendment, should have no weight, if the sections referred to are inconsistent with the amendment.

It is of more importance to the people that they have the right, at their option, to reject at the polls a resolve or resolution that removes from office a person elected by them to office, than it is to have the right, at their option, to approve or reject at the polls other resolves or resolutions; but whether of more importance or not, the Constitution is the organic law, and not only individuals, but every department of the government is bound by it and must respect it.

The Constitution is the peoples' protection, not only against the will of the majority, but also against acts of the legislative, executive and judicial departments of the government, and by the Constitution they reserve for ninety days after the recess of the Legislature the option of deciding whether they will exercise at the polls their right to approve or reject resolves and resolutions passed by both branches of the Legislature, and that no such resolve or resolution shall take effect until ninety days after the recess of the Legislature. The resolve relied upon in this case was passed by both branches of the Legislature and affects the rights of the relator; by the clear and unambiguous language of the Constitution it could not take effect until ninety days after the recess of the Legislature, and, as the Legislature adjourned on April 12th, it could not take effect until July 12th, 1913, and the attempted removal of the relator by virtue of the resolve was May 8th, and must therefore be held void.

It is said that the people did not intend, by the constitutional amendment, to reserve the power to accept or reject at the polls all joint resolves and resolutions, but that there should be read into the amendment, after the words "no act or joint resolution of the legislature" the words "having the force of law," and as the resolve under discussion did not have the force of law, and did not require the signature of the Governor, but was only the basis of the address proceedings, the people had no right to pass upon it at the polls, and to hold otherwise would practically repeal the power of address.

If the words of the amendment are given the meaning that they plainly and clearly express, the Legislature can pass an address against a public officer, if two-thirds of the members elected to each house so vote, and it may be wise that a bare majority of each house should not have the power to remove from office one elected by the people, unless the people have the power to accept or reject their act at the polls, while if the power can only be exercised by two-thirds of the members elected to each house, as provided by the amendment, there is less danger that the will of the people will be ignored, and to give the amendment the meaning conveyed by the language used would not destroy the power of address, but would make its use conform to the will of the people and prevent its being used against their wishes.

The Constitution says no act or joint resolution, excepting certain enumerated ones, shall take effect for ninety days, and the resolve

in question is not one of the enumerated ones. The English language, if it means anything when it says "no act or joint resolution of the legislature," includes the resolution which was the basis of the address proceedings. By what process of reasoning can any one read into the sentence "no act or joint resolution of the legislature" the words "having the force of law"? The language is as plain as it can be. It needs no construction to ascertain its meaning, and the rule of law is that it is only when words are obscure or doubtful that we have any discretionary power in giving them a construction, or to take into consideration the consequences, that the intention cannot be ascertainéd, by adding to or detracting from the meaning conveyed by the plain, unambiguous language used; and if the words used convey a definite meaning which involve no absurdity or contradiction between parts of the same writing, that the meaning upon the face of the instrument is the one alone which we are at liberty to say was intended to be conveyed. There is no need of the construction of plain words, whose meaning is understood by all. If the words "having the force of law" are read into the amendment, they render useless the words "except such orders or resolutions as pertain solely to facilitate the performance of the business of the Legislature, of either branch, or of any committee or officer thereof."

The effect of reading the words into the amendment of the Constitution is to add an exception not enumerated in the amendment, and where the statute or Constitution enumerates the things upon which it is to operate or forbids certain things, is to be construed as excluding from its effect all those not expressly mentioned.

The following, from a few of the many cases that are too numerous to cite, conclusively demonstrate that we have no right to construe the language of the amendment so that the people will have no right to accept or reject the joint resolution as a basis for address proceedings, unless it pass both houses by a two-thirds vote of the members elected:

"The general rule is perfectly well settled that, where a statute is of doubtful meaning and susceptible upon its face of two constructions, the court may look into prior and contemporaneous acts, the reasons which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances and the purpose intended to be accomplished by it, to determine its proper construction. But

where the act is clear upon its face, and when standing alone it is fairly susceptible of but one construction, that construction must be given it. Heydon's case, 3 Coke, 76; *United States* v. *Freeman,* 3 How., 566; *Smythe* v. *Fiske,* 23 Wall., 374; *Platt* v. *U. P. R. R. Co.,* 99 U. S., 48; *Thornly* v. *United States,* 113 U. S., 310; *Viterbo* v. *Friendlander,* 120 U. S., 707; *Lake County* v. *Rollins,* 130 U. S., 662; *United States* v. *Goldenberg,* 168 U. S., 95. This rule has been repeatedly applied in the construction of the revised statutes." *Hamilton* v. *Rathborne,* 175 U. S., 414.

As stated by Endlich on Interpretations of Statutes, in his chapter treating of constitutions: "And, where a provision general in its language, is followed by a proviso, the rule applicable to such cases occurring in statutes has been applied to constitutions, viz.: that the provision is to be strictly construed, as taking no case out of the provisions that do not fairly fall within the terms of the proviso, the latter being understood as carving out of the provisions only specified exceptions, within the words as well as within the reason of the former." Sec. 526.

"The natural import of words is that which their utterance promptly and uniformly suggests to the mind,—that which common use has affixed to them." *Hughes* v. *May,* 3 Mich., 605.

"To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural significance of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. * * * The object of construction applied to the constitution is to give effect to the intent of the framers, and the people in adopting it. This intent is to be found in the instrument itself." *Hawkins* v. *Carroll Co. Commissioners,* 50 Miss., 735, quoting *Newell* v. *Phillips,* 7 N. Y., 97.

"It is not allowable to interpret what has no need of interpretation, and when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning." *Breadstown* v. *Virginia,* 76 Ill., 34.

Chief Justice Marshall, in *Gibbons* v. *Ogden,* 22 U. S., 188, says: "The framers of the constitution and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they said."

"We are to suppose that the authors of such an instrument had a thorough knowledge of the force and extent of the words they employed." *Henshaw* v. *Foster,* 9 Pick., 317.

"What the court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require." Cooley on Constitutional Limitations, secs. 54-55.

In *Coffin* v. *Rich,* 45 Maine, 511, the court say: "It is only when the words of a statute are obscure, or doubtful, that we have any discretionary power in giving them a construction, or can take into consideration the consequences of any particular interpretation," and then quotes 4th Bacon's Abridgment, 652; "If the meaning of statutes is doubtful, the consequences are to be considered in the construction of them; but if the meaning be plain, no consequences are to be regarded, for that would be assuming legislative authority."

*Clark* v. *Railroad,* 81 Maine, 477: "If the language of a statute be clear and plain, courts have no authority, in consideration of the consequences resulting from it, to give it a construction different from its natural and obvious meaning."

"Whenever the situation of the party was such as, in the opinion of the legislature, to furnish a motive for excepting him from the operation of law, and the legislature has made the exception, it would be going far for this court to add to those exceptions." Chief Justice Marshall in *McIver* v. *Regan,* 2 Wheat, 29.

"Why not assume that the framers of the constitution, and the people who voted it into existence, meant exactly what it says? At the first glance, its reading produces no impression of doubt as to the meaning. It seems all sufficiently plain; and in such case there is a well settled rule which we must observe. The object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous the courts in giving construction thereto, are not at liberty to search for its meaning beyond the instrument.

"To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the

natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. . . .

"There is even stronger reason for adhering to this rule in the case of a constitution than in that of a statute, since the latter is passed by a deliberative body of small numbers, a large proportion of whose members are more or less conversant with the niceties of construction and discrimination, and fuller opportunity exists for attention and revision of such a character, while constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in a state, the most of whom are little disposed, even if they were able, to engage in such refinements. The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption.

"Such considerations give weight to that line of remark of which *People* v. *Purdy,* 2 Hill, 35, affords an example. There, Bronson, J., commenting upon the danger of departing from the import and meaning of the language used to express the intent, and hunting after probable meanings not clearly embraced in that language, says: 'In this way . . . the constitution is made to mean one thing by one man and something else by another, until in the end it is in danger of being rendered a mere dead letter, and that, too where the language is so plain and explicit that it is impossible to mean more than one thing, unless we lose sight of the instrument itself and roam at large in the fields of speculation.'

"Words are the common signs that mankind make use of to declare their intention to one another; and when the words of a man express his meaning plainly, distinctly and perfectly, we have no occasion to have recourse to any other means of interpretation." *Board of County Commissioners* v. *Rollins,* U. S. Supreme Court, 130, 662.

"We live under a government of laws, reaching as well to the legislative as to other branches of government; and if we wish to uphold and perpetuate free institutions, we must maintain a vigilent watch against all encroachments of power, whether arising from mistake or design, and from whatever source they may proceed.

The constitution is explicit in its terms, in the particular class of cases upon which the legislature may act." . . .

"Written constitutions of government will soon come to be regarded as of little value, if their injunctions may be thus slightly overlooked; and the experiment of setting a boundary to power, will prove a failure. We are not at liberty to presume that the framers of the constitution, or the people who adopted it, did not understand the force of language." *People* v. *Prouty,* 2 Hills, 36.

The above has been quoted in many opinions.

In this connection it is well to ponder the oft-quoted words of Chief Justice Bronson in *Oakley* v. *Aspinwall,* 3 N. Y., 368, where he said:

"It is highly probable that inconveniences will result from following the constitution as it is written. . . . It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office upon themselves; or if under color of construction, or upon any other specious grounds, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be worse than useless. Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the Legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the Constitution which nothing can heal. One step taken by the Legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow, and so the process goes on,

until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them."

In *Pelletier* v. *O'Connell,* 111 Maine, (88 Atlantic Reporter, 55), the rule is stated: "It is equally true that that intention cannot be ascertained by adding to or detracting from the meaning conveyed by the plain unambiguous language used," . . . citing from *Davis* v. *Randall,* 97 Maine, 36. "When clear and unequivocal language is used which admits of only one meaning, it is not permissible to interpret what has no need of interpretation." This language was approved in the Opinion of the Justices, 108 Maine, 548, in the following language: "It has accordingly been distinctly stated from early times down to the present day, that 'judges are not to mould the language of statutes in order to meet an alleged inconvenience or an alleged equity, . . . and are not to alter plain words though the legislature may not have contemplated the consequences of using them.'" And also quotes from Endlich on the Interpretation of Statutes, sec. 4: "When indeed the language is not only plain, but admits of but one meaning, the task of interpretation can hardly be said to arise. Such language best declares, without more, the intention of the law giver and is decisive of it. The legislature must be intended to mean what it has plainly expressed, and consequently there is no room for construction. It is therefore only to the construction of statutes whose terms give rise to ambiguity, or whose grammatical construction is doubtful, that courts can exercise the power of controlling the language in order to give effect to what they supposed to have been the real intention of the law makers. Where the words of the statute are plainly expressive of an intent, rendered dubious by context, the interpretation must conform to and carry out that intent. . . . Where, by the use of clear and unequivocal language capable of only one meaning, anything is indicated by the legislature, it must be enforced, even though that be absurd or mischievous. If the words go beyond what was probably the intention the effect must nevertheless be given to them."

The fact that the Legislature of 1911 passed an address, and that it was acted upon by the Governor precisely as in this case, cannot be considered as of any weight in the construction of the amend-

ment by the court, because the Legislature may suspend laws by virtue of the Constitution, but it cannot suspend the Constitution, nor can it authorize any department of the government to suspend it. "We are bound to take judicial notice of the doings of the executive departments of the government and, when called upon by proper authorities, to pass upon their validity." Opinion of the Justices, 70 Maine, 609.

"Where its terms are plain, clear and determinate, they require no interpretation, and it should therefore be admitted, if at all, with great caution, and only from necessity either to escape some absurd consequence or to guard against some fatal evil. . . . Contemporary construction is properly resorted to, to illustrate and confirm a context, to explain a doubtful phrase, to expound an obscure clause. . . . It can never abrogate the text; it can never narrow down its true limitations; it can never enlarge its natural boundaries. First Story Cons., secs. 405-407. Acquiesence for no length of time can legalize a clear usurpation of power where the people have plainly expressed their will in the Constitution, and appointed judicial tribunals to enforce it. A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period in violation of constitutional prohibition without the mischief which the Constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the Constitution. We think we allow a contemporary and practical construction its full legitimate force when we suffer it, where it is clear and uniform, to solve in its own favor the doubts which arise on reading the instrument to be construed. Cooley's Cons. Limitations, 84, 85.

"An examination of the cases in the Supreme Court of the United States will disclose the fact that long usage, contemporaneous construction, and practical interpretation have been resorted to in construing statutes and constitutional provisions only to ascertain the meaning of technical terms, or to confirm a construction deduced from the language of the instrument, or to explain a doubtful phrase or expound an obscure expression. *Calder* v. *Bull,* 3 Dall, 368; *United States* v. *Wilson,* 32 U. S., 150; *Martin* v. *Hunter,* 14 U. S., 304; *Cohens* v. *Virginia,* 6 Wheat., 264; *United*

*States* v. *Dickson,* 40 U. S., 141; *Pigg* v. *Pennsylvania,* 41 U. S.,
539; *Cooley* v. *Philadelphia,* 53 U. S., 299; *Hahn* v. *United States,*
107 U. S., 402; *Burrows Co.* v. *Sarony,* 111 U. S., 53; *Brown* v.
*United States,* 113 U. S., 568; *McPherson* v. *Blacker,* 146 U. S., 1."
*State of New Jersey, by Morris,* v. *Wightson,* 22 L. R. Ann., 548.

The rule of law that where clear and unambiguous language is
used in a statute, that admits of only one meaning, that that mean-
ing must be accepted by the court as the meaning intended, was
clearly established in Heydon's Case, 3 Coke, 76, cited in 175 U. S.,
409, and the doctrine that the court cannot allow an exception not
expressed in the statute containing the exception, subject to the
qualification to obviate a construction which would be unjust,
oppressive and unreasonable, was established beyond all controversy
in the case of *Stowell* v. *Lord Zunch,* Plowd., 350, decided in the
year 1569, in which suit there was involved the title to eighty mes-
sauges and twenty-two hundred and eighty acres of land, was
argued in the Exchequer Chamber before all the Justices of Eng-
land, presided over by Chief Baron Saunders. So important was
the case that at the consultation several of the justices occupied a
whole day in stating their views and reasons.

There is an unbroken line of decisions following the rule laid
down in those two cases. Only a few of them are cited above, but
they have been followed in all common law courts, and unless some
valid reason can be given for a change, neither the legislative, exec-
utive nor judicial departments of the government should disregard
those rules of law enforced by the courts for more than three cen-
turies, to defeat the will of the people plainly expressed in the
Constitution, (for the alleged reason, that they did not mean what
they plainly expressed); by reading into the Constitution words
that changed the meaning as therein expressed and thereby take
from the people power they reserved to themselves.

The plain and obvious language of the Constitution, as amended,
sustains the position of the relator. The amendments is as plain
as the English language can make it. To hold the address pro-
ceedings valid, we must disregard the rules of law for the con-
struction of statutes and constitutions that have been followed by
courts, without exception, for centuries, and disregard the warning
so clearly set forth in the authorities above cited. In view of the

clearness of statement and force of reasoning contained in the eminent authorities cited, this court may well hesitate to enter a field so speculative and dangerous.

The constitutional question is clearly before the court, and as the Constitution prohibits address proceedings in the manner they were passed by the Legislature and acted upon by the Governor and Council, it is the duty of the court to declare them void and the relator entitled to judgment of ouster.